**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DOROTHEA MONTALVO PUENTE,

          Petitioner,

   vs.

GWENDOLYN MITCHELL, Warden,

          Respondent.

_____

No. C 02-4129 JSW

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

      Dorothea Montalvo Puente (hereinafter "Petitioner") petitions for a writ of habeas corpus pursuant to 28 U.S.C § 2254 challenging her 1993 conviction following a trial by jury.  Petitioner raises several claims and a request for a federal evidentiary hearing.  Respondent, Gwendolyn Mitchell (hereinafter "Respondent"), Warden of the Central California Women's Facility, Chowchilla, California, opposes the petition.  On January 28, 2003, this Court ordered Respondent to show cause why the writ should not be granted.  On July 16, 2003, Respondent filed an answer to the petition.  On December 3, 2003, Petitioner filed a traverse.  Having reviewed the parties' papers, the record, and having carefully considered the arguments and relevant legal authorities, the Court hereby DENIES the petition for a writ of habeas corpus and the request for an evidentiary hearing.

## PROCEDURAL BACKGROUND

      On July 3, 1990, Petitioner was charged by information filed in the Sacramento County Superior Court with nine counts of first-degree murder and a multiple murder special circumstance.  (Cal. Pen. Code §§ 187, 190.2(a)(3).)  On February 19, 1992, the trial court granted Petitioner's motion for a change of venue and the case was transferred to Monterey County Superior Court on July 9, 1992.  On July 15, 1993, after eight months of trial, the jury began its deliberations on the guilt phase.  On August 26, 1993, the Monterey County jury convicted Petitioner of two counts of first-degree murder (counts five and seven), one count of second-

degree murder (count four), and found true the multiple murder special circumstance.[1]   The trial court declared a mistrial as to the remaining counts and granted the prosecution's motion to dismiss these counts.

After a separate penalty phase deliberation, the jury was unable to reach a verdict.  The trial court declared a mistrial and the prosecution elected not to pursue retrial of the penalty phase.  On December 10, 1993, the trial court sentenced Petitioner to two concurrent terms of life without the possibility of parole on counts five and seven and one concurrent term of fifteen-years to life on count four.  Petitioner is currently incarcerated at the Central California Women's Facility, Chowchilla, California.

## I.        State Habeas Proceedings

On June 21, 1993, Petitioner appealed the judgment of conviction to the California Court of Appeal for the Sixth District Court of Appeal (hereinafter "California Court of Appeal") on direct appeal and also filed a state habeas corpus petition.  On August 28, 1997, the California Court of Appeal issued an opinion affirming the judgment on direct appeal but issued an Order to Show Cause returnable in the state trial court on claims raised in the state habeas petition. (*People v. Puente*, *In re Dorothea Montalvo Puente*, Nos. H12238, H014120, unpublished op at 2-35 (Cal. Ct. App. Op., August 28, 1997) attached to petition (hereinafter "Pet'r Ex. A").)  In September 1998, the superior court held an evidentiary hearing subject to the Order to Show Cause.  (*In re Puente*, Monterey Superior Court No. HC3145, Jan. 16, 1998 attached to petition (hereinafter "Pet'r Ex. C")).  On December 10, 1997, the California Supreme Court denied review of the cross-petitions filed by Petitioner and Respondent.  On September 25, 1998, the state superior court found that there had been no juror misconduct and denied the petition on the merits.

On March 15, 1999, Petitioner challenged the superior court's denial of the claims subject to the Order to Show Cause in a renewed petition for a writ of habeas corpus to the California Court of Appeal.  In that petition, Petitioner raised three "new claims" of juror misconduct.  On July 20, 2000, the California Court of Appeal issued a written opinion denying state habeas relief as to the findings made at the evidentiary hearing and found Petitioner's new juror misconduct

---

[1]  As to four of the six remaining counts, the jury hung 11-1 on the charges of first-degree murder.

1  claims procedurally barred.[2]  (*In re Puente*, No. H019776, slip op. (Cal. Ct. App., July 20, 2000)

2  attached to petition (hereinafter "Pet'r Ex. D")).  On November 15, 2000, the California Supreme

3  Court summarily denied review of the new petition and on May 23, 2001, denied Petitioner's

4  original petition for state habeas relief without comment.  (*People v. Puente*, *In re Puente*, Nos.

5  S091404, S092059, attached to petition (hereinafter "Pet'r Exs. E, F")).

6  **II.  Federal Court Proceedings**

7  Following exhaustion of her claims in the California state courts, on August 28, 2002,

8  Petitioner timely filed her federal petition for writ for habeas corpus now before the Court.[3]

9  Petitioner raises several claims challenging the constitutionality of her convictions.  She contends

10  that: (1) the evidence presented at trial was constitutionally insufficient to support the convictions;

11  (2) she was denied constitutionally sufficient notice that the prosecution would rely on first-degree

12  murder by poison and second-degree felony murder theories at trial; (3) the trial court's instruction

13  on duty of care denied Petitioner her right to a jury determination of that issue beyond a

14  reasonable doubt; (4) the trial court's exclusion of certain evidence regarding a toxicologist who

15  testified as a prosecution witness denied Petitioner her rights to present a defense and to confront

16  and cross-examine the witness; and (5) she was denied the right to have competent and impartial

17  jurors due to alleged instances of juror misconduct which warrant federal habeas relief or a federal

18  evidentiary hearing.  (Pet. at 1-14; Traverse at 1-2 .)

19  **FACTUAL BACKGROUND**

20  The following facts regarding Petitioner's claims and underlying offenses are taken

21  verbatim from the unpublished opinion of the California Court of Appeal.

22  **I.  The Crime**

23  **[Ruth Clausen Munroe]**

24

25  [2]  The California courts enforce time limits on the filing of petitions for a writ of habeas corpus.  It is only the violation of a state procedural rule and not, for example, mere failure to raise a claim in circumstances where no rule requires raising it, that triggers the procedural default doctrine.  *See English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *In re Robbins*, 18 Cal. 4th 770, 780 (Cal. 1998).

26

27

28  [3]  On August 22, 2002, the United States District Court for the Eastern District of California granted Respondent's motion to transfer venue to this District.  On January 12, 2003, the case was reassigned to this Court for all further proceedings.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

These events revolve around a house located at 1426 F Street in downtown Sacramento. This house was owned by Ricardo Ordorica. Defendant referred to Ordorica as her nephew, and Ordorica referred to defendant as his aunt because they were "very close" although they were not related. The house had two floors, and Ordorica and his family lived in the downstairs flat. In 1981 or 1982, defendant began renting the upstairs flat. At first she lived there alone. Defendant had previously run a "room and board" facility in Sacramento in the 1970's. The first person who came to live with her in the upstairs flat was Ruth Clausen Munroe (hereafter Munroe). Munroe had been a clerk in a downtown Sacramento pharmacy until she retired in 1980. She only rarely drank alcohol. In November 1980, she had been prescribed Tylenol and codeine for pain. After she retired, she married Harold Munroe (hereafter Harold) in June 1981. Harold was an alcoholic. Harold introduced Munroe to defendant sometime in the fall of 1981. Munroe did not like Harold's drinking. In January 1982, Munroe was prescribed meprobamate, a tranquilizer. Harold had been prescribed Tylenol with codeine. Harold was thereafter diagnosed with terminal cancer and did not have long to live. In March 1982 Harold was admitted to a hospital which he was not expected to return.[4] Munroe visited Harold several times at the hospital. These visits were "upbeat."

Munroe and defendant had become "best friends" and then partners in a food service operation which served breakfast and lunch in a Sacramento bar for two or three months ending in April 1982. On April 11, 1982, a few weeks after Harold went into the hospital, Munroe moved into the upper flat at 1426 F Street to live with defendant. Munroe had filed for a divorce from Harold because they were having financial difficulties paying his medical bills because there were married. At the time she moved in with defendant, Munroe was a healthy and happy 61-year-old woman, and she was looking forward to living with defendant rather than living alone. She had five children, four of whom lived in Sacramento and eighteen to twenty grandchildren. Munroe's children visited her frequently, some of them daily, at 1426 F Street.

Sometime in the middle of April, Munroe visited a friend of hers at her friend's house. Munroe was in good health, and she showed her friend a large amount of money she had in her purse and told her that she had "eleven hundred [dollars] in her purse." A week after Munroe moved in with defendant, the food service operation ceased, apparently because the "business didn't work out." On April 25, Munroe encountered another friend at the beauty parlor where they were both having their hair done. This friend usually saw Munroe each week at the beauty parlor. Until this time, Munroe had been in a "fine" state of health. Although Munroe was "sad" that her husband was dying of cancer, she was upbeat and "a very happy, happy woman." However, on April 25, Munroe told her friend "I am so sick I feel like I am going to die." Munroe looked "drawn" and "pale," and she was crying. Her friend thought she looked "like she should have gone to the hospital," and she told Munroe this. The friend asked Munroe what was wrong with her, and Munroe said she did not know and would talk to her later. Munroe told her hairdresser that she was "sick" and "felt awful."

On the evening of April 25, Munroe's son William visited her at 1426 F Street and noticed that she "looked tired." She did not appear to be depressed. He also observed that she had "a drink in her hand." Munroe was sipping a green liquid. He thought this "odd" since she did not drink alcohol. William asked her about the drink, and she said "it was just a drink that Dorothea had fixed her, Crème de Menthe." Munroe told him that defendant had fixed her a drink to "calm her

---

[4]  Harold died on May 27, 1982.

4

United States District Court

For the Northern District of California

nerves" and "relax her." Over the next two days, Munroe's condition worsened. On April 27, William came to visit her and found her in her bedroom. Defendant told him that Munroe "was sick and not to bother her," and she tried to keep him from going into Munroe's bedroom. Defendant said that "the doctor was just here and gave her a shot, she's sleeping, let her sleep." Defendant told William that Harold had been calling on the phone and "harassing" Munroe and that Harold had hit Munroe with his cane. William went into his mother's bedroom and found her in bed. At first he thought she was asleep, but then he noticed that her eyes were open and she was staring at him. However, she did not speak. He did not summon medical attention because "we trusted Dorothea" and believed that "she would take care of [Munroe]." Defendant had told Munroe's family that she had worked as a nurse or nurse's aide. A friend of Munroe telephoned defendant's residence that evening and asked to speak with Munroe. Defendant said that Munroe had just been given a shot by the doctor and was sleeping.

Munroe's daughter Rosemary also visited her that evening at around 8 p.m. Rosemary had been concerned about her mother for a few days because she had been "totally exhausted" and had complained of not feeling well. She had seemed to be "in a fog" that was "kind of trance like." Rosemary encountered defendant when she arrived at the residence. Defendant told her that Munroe was sleeping and that "she'd taken [Munroe] to the emergency Medical Center and got her a shot because she'd been under a lot of stress and to leave her - - just let her rest." Although defendant told her to "leave her alone," Rosemary went to Munroe's bedroom and found her "sound asleep" in bed. She gave her a hug and kiss and checked her pulse. Munroe did not awaken, but Rosemary detected a pulse.

At 5:30 a.m. the next morning, defendant telephoned Rosemary, said that "something is wrong with your mother" and told her that she "better get over here right away." When Rosemary arrived, defendant told her "[y]our mother is dead." Defendant told the authorities that Munroe had "a heart condition," had experienced arm, side and chest pain the previous evening, "had been sick in bed for the past few days," and "was having emotional problems" as a result of her "divorce situation" because her terminally ill husband did not want a divorce. She also claimed that Munroe had been alive at 4 a.m. but unresponsive at 5:45 a.m. When one of Munroe's family members talked to defendant about the circumstances of Munroe's death and asked about the "shot" defendant had claimed Munroe had been given, defendant said that there had been no doctor and "that was a misunderstanding, that it was a shot of alcohol." Munroe had not been treated at the local medical center at any time in April 1982.

Toxicological testing of Munroe's blood revealed "very high levels" of acetaminophen (Tylenol) and codeine well beyond a therapeutic dosage level in addition to a "therapeutic level" of meprobamate. Although the Tylenol level was lethal, it did not cause Munroe's death because it takes more time for Tylenol to cause death as a result of liver failure than for codeine to cause death as a result of respiratory depression. Munroe's death had been the result of "respiratory depression" caused by a massive overdose of codeine. Codeine causes a coma and then death through respiratory depression within two to four hours. It was estimated that Munroe had died "somewhere around midnight, give or take 2 or 3 hours on either side." The autopsy revealed "necrosis" of Munroe's liver. Necrosis of the liver can be caused by Tylenol, but it takes "a minimum of 2 days to 5 or 7 days" of excessive amounts of Tylenol to produce such "necrotic" changes. An individual who ingests a lethal dose of Tylenol will experience "nondescript symptoms" for one to three days followed by a coma and then death. Necrotic changes cannot occur within a few hours. No alcohol was detected in Munroe's blood, but her stomach contained about five ounces of a "dark green fluid material that smelled a

5

little bit mint like." There was no evidence of trauma or injury to her body. At the time, it was assumed that Munroe had committed suicide, but the coroner classified the cause of death as "undetermined." A few months later, after reading that defendant had been convicted of "drugging other people," Munroe's children became suspicious.

**[Everson Gillmouth]**

In August 1982, defendant was convicted of administering a controlled substance to another (Pen. Code, § 222), grand theft (Pen. Code, §§ 487.1,487.2) and forgery (Pen. Code, § 470), and she was committed to state prison for a five year term. While defendant was in prison, Ordorica cashed defendant's government benefits checks by signing her name to them. Defendant had given him "a power of attorney" so that he could do so. Defendant returned to Sacramento upon her release from prison on September 9, 1985.

Defendant moved back into the upstairs flat at 1426 F Street which she now shared with Everson Gillmouth.[5] Gillmouth was 77 years old and in "relatively good medical condition" in August 1985. He had been receiving Social Security retirement (hereafter SSA) benefits since 1973. His monthly SSA benefits amounted to $632. He also received monthly pension checks for $42.59. Gillmouth owned a truck and a trailer. He left his home in Oregon with his truck and trailer in the middle of August 1985 with the intent of residing with defendant at 1426 F Street. On August 26, 1985, the address to which his SSA checks were sent was changed to 1426 F Street. Gillmouth arrived in Sacramento around September 1, 1985 and he moved into the upper flat at 1426 F Street. Defendant had told Ordorica to expect Gillmouth. Gillmouth and Ordorica drove down to Fresno in Gillmouth's truck to pick defendant up from prison. Gillmouth spoke with his sister in Oregon by phone in the middle of September 1985. This was the last time she heard from him.

Beginning in early October 1985, defendant began writing checks on the joint checking account Gillmouth had opened in both their names. In October 1985, a $500 check from Gillmouth, deposited by defendant in her savings account, was returned by the bank unpaid. Defendant wrote Gillmouth's sister in October 1985 and informed her that defendant and Gillmouth were planning to get married on November 2. Defendant asserted that Gillmouth had "sold" his trailer. In November, Gillmouth's sister received a mailgram dated November 2 which purported to be from Gillmouth. It indicated that Gillmouth was going to Palm Springs. In November or December 1985, defendant forged Gillmouth's signature on certificates of title transferring ownership of his truck and his trailer to other persons.

In November or early December 1985, defendant asked a handyman who was doing some remodeling work for her to build a box "for storage" to her specifications. Defendant gave him specific measurements for the box. The box was to be 5 or 6 feet long, 2 or 3 feet wide and 2 feet high. Defendant also asked him to make a lid for the box. She agreed to give this handyman Gillmouth's truck in return for his remodeling and box building work and $800. Defendant gave the handyman a certificate of title on which she had forged Gillmouth's signature. The handyman never saw anyone other than defendant living in the upstairs of the residence. He built the box in the living room of defendant's flat. After building the box, he left it empty, with the lid beside it, overnight. When he returned the next day, the box was in the kitchen with the lid nailed down. The box now weighed

---

[5] She paid $325 a month in rent to Ordorica.

6

about 300 pounds. Defendant said that she had nailed the box shut, and she asked the handyman to help her take the box to a storage place. Defendant had rented a dolly to use in moving the box. The handyman and another man put the box in Gillmouth's truck, and defendant directed the handyman to drive away from Sacramento on a levee road. After driving for about an hour, the handyman said they had gone too far, and defendant told him to turn around. When they turned off the road to turn around, defendant told him to dump the box by the river. He did so.

On January 1, 1986, a body was found in a wooden box abandoned next to a tree by a dirt road off of a levee road known as the Garden Highway alongside the Sacramento River in Sutter County.[6] The box was found in an area where "people" are "always dumping stuff off." A fisherman discovered the box sitting about three feet from the bank of the river. It appeared that the box had been covered with a lid which was nailed down all the way, but the lid had already been removed when the box was found by the fisherman. The fisherman contacted authorities. Although an autopsy was performed immediately, the body was not identified as Gillmouth until early 1988. Gillmouth's body was clad in undershorts [sic] and a T-shirt. It was wrapped in "numerous black plastic bags" and then wrapped in clear plastic with a bed sheet as the outside layer. The plastic was held in place with black electrical tape. In the box with the body were some moth balls and "blue toilet deodorizer." A watch was on Gillmouth's wrist. There was no evidence of trauma to his body. The body was "markedly decomposed." A blood sample was collected for toxicological testing, and tissue samples were preserved but not submitted for toxicological testing. The blood sample was tested but it was subsequently deemed "not suitable" for most toxicological testing procedures. Gillmouth had been dead for "at least weeks" before January 1, 1986. The cause of death was "indeterminate." In 1990, Gillmouth's tissue sample was tested and no drugs were detected in it. However, it could not be determined whether the absence of findings was due to absence of drugs or the use of a preservation method which interfered with toxicological analysis.

In January 1986, Gillmouth's SSA checks were redirected to a Sacramento bank account. In February 1986, Gillmouth's pension benefit checks were redirected to a different Sacramento back account. After the bank returned several SSA checks, an April 1986 letter, which purported to be from Gillmouth, requested that the checks be directed to 1426 F Street. In April 1986, defendant wrote a letter to Gillmouth's sister which purported to be from Gillmouth and "Irene" in which "Irene" asserted that Gillmouth had had a stroke in January 1986 and sold his trailer and truck. She claimed that she and Gillmouth were living in Oklahoma. A retroactive check for more than $2500 in SSA benefits, representing several months' benefits to account for the returned checks, was sent to 1426 F Street in July 1986. In September 1986, Gillmouth's SSA and pension benefit checks were redirected to "General Delivery" in Banning, California. The checks sent to Banning were returned uncashed.

Brenda Trujillo became acquainted with defendant in 1982 when they served time in jail and prison together. Defendant told Trujillo in 1986 that "Gill" had a heart attack and died. Defendant said that she "couldn't afford to call the ambulance because he was dead, and she didn't want to go back to prison." She asked Trujillo if she "knew anybody that can get rid of the body" and offered to pay $4000 for such assistance. Trujillo said that she would "ask around." Defendant subsequently told Trujillo that "Gill was buried in her garden."

---

[6] Sutter County is the next county north of Sacramento County. The body was found about three miles north of the Sacramento County line.

7

**United States District Court**

For the Northern District of California

Defendant thereafter began running a "room and board house" at 1426 Street.[7] Because the conditions of her federal parole[8] didn't permit her to run a boardinghouse, she endeavored to conceal the fact that she was renting out rooms. Initially, she only rented out rooms in the upper flat, and Ordorica and his family continued to live on the first floor. John McCauley became one of defendant's first tenants in the upstairs flat in mid-1986. In July 1986, Ordorica moved out of the downstairs flat at 1426 F Street. However, some of his relatives continued to reside in the downstairs flat until February 1987. In May 1987, defendant began renting out rooms in the lower flat in addition to rooms in the upper flat.[9] There were four downstairs bedrooms and three upstairs bedrooms. Defendant and McCauley continued to live in two of the upstairs bedrooms. Virtually all of her tenants were alcoholics. Defendant provided meals, laundry facilities and "a safe place for individuals to live," but her residence was not a "board and care" facility and did not provide the services associated with such a facility. However, at times, defendant told others that she had previously run board and care facilities, that she was skilled in caring for elderly individuals and even that she "was a M.D. doctor." Defendant did not provide transportation for her tenants to medical appointments, although she would sometimes give them money for bus or cab fare to get to an appointment and she kept track of her tenants' medical appointments on a calendar.

Defendant was a strong woman who could lift and carry a sack of cement weighing more than 90 pounds. One of defendant's house "rules" was that her tenants were not permitted to take their mail out of the mailbox. She would fetch the mail and distribute it to her tenants. Many of her tenants were recipients of financial benefits from the state or federal government. Their monthly state and federal checks would be sent through the mail. Food stamps identification cards were also sent to recipients by mail. An individual who lived alone could collect $87 a month in food stamps in 1988. Once it was determined that an individual was eligible for food stamps, the individual would continue to receive food stamps for one year. However, individuals who lived in room and board establishments were considered ineligible for food stamps. General assistance benefits provided about $270 per person per month at that time, and an individual could continue to receive such funds indefinitely so long as he or she qualified.

The federal government provided more generous benefits under the Supplemental Security Income (SSI) program for needy individuals who had no source of income and were mentally or physically disabled, blind or over the age of 65. SSI is "a federal welfare program." This program was administered by the Social Security Administration, but it was completely distinct from the Social Security (SSA) program which was funded by an individual's "FICA taxes" during his or her working life. Individuals who received SSI did not need to have worked to qualify for SSI. Eligibility for SSI benefits was based on need, and the benefit amounted to about $637 a month per person in 1988. However, an individual receiving SSI was not eligible for general assistance or food stamps. Any "physical or mental or emotional" disability which "prevents you from doing work" was sufficient to qualify for SSI. Individuals receiving SSI could designate a "representative payee" to receive their SSI checks for them. The representative payee was required to report to the Social Security Administration if the individual moved or died, and the payee was required to report on a yearly basis as to how the money had been used. Once an individual qualified for SSI benefits, the benefits

---

[7] She did not run a "board and care facility."

[8] Defendant had been convicted of forging a U.S. Treasury check in 1978.

[9] She started paying Ordorica $700 a month in rent.

continued to be paid indefinitely.  Those who qualified for SSI benefits were automatically entitled to be paid indefinitely.  Those who qualified for SSI benefits were automatically entitled to MediCal health benefits.  MediCal cards, which signified an individual's eligibility for MediCal coverage, were sent to qualifying individuals every month.

Other government benefit programs provided smaller benefits to specific groups of individuals.  The state's Home Energy Assistance Program (HEAP) provided a yearly benefit of between $30 and $400 to low-income individuals to help them pay utility bills.  The state's Renter's Assistance Program (RAP) provided a yearly benefit of up to $240 to elderly, blind and disabled renters to compensate for "property taxes presumed to have been paid by renters' renting [sic] payments."  In order to receive RAP benefits, a person was required to apply between May 18 and August 31 of the following year for benefits for the previous year.  The state also offered renters a credit of $60 annually which could be used as a credit on taxes or refunded to the renter.  This credit was available to every renter in a room and board house so long as each was "a separate individual household."

Like many of her tenants, defendant was a recipient of SSI benefits on the basis of a diagnosis of chronic schizophrenia.  She had been receiving these benefits continuously since 1978 even though prisoners are ineligible for SSI benefits and defendant had been incarcerated from August 1982 to September 1985.  HEAP, RAP and Renter's Credit benefits were obtained by defendant in her own name as well as in the names of many of her tenants.  Defendant was also the recipient of many flurazepam prescriptions for several years.  Flurazepam, also known as Dalmane, is a hypnotic sedative which is used to induce sleep.  It is not a very strong drug.  "It helps you fall asleep.  It doesn't knock you out."  Between October 1985 and September 1988, defendant filled 35 prescriptions for flurazepam including 4 months in which she filled more than one prescription for flurazepam.[10]  Most of these prescriptions were for "a month's supply" of flurazepam, or thirty 30-miligram capsules, to be taken each night at bedtime.

**[Betty Palmer]**
Betty Palmer arrived at 1426 F Street at some point in the fall of 1986.  Palmer was a strange, secretive 78-year-old woman who had been diagnosed several times with various psychiatric disorders and had been receiving SSI benefits since 1974.  Palmer had a current prescription for an antipsychotic drug called Haloperidol.  Palmer had been prescribed flurazepam in 1985 after she fractured her hip, and she continued to take pain medications "chronically" for hip pain.  She liked sedatives and pain medication, and she repeatedly asked physicians to prescribe benzodiazepines (a group of drugs including flurazepam) for her.  Palmer had a history of seeking medical treatment and then signing herself out against medical advice.  Defendant obtained a California Identification Card bearing Palmer's name and defendant's picture on October 14, 1986.  In December 1986, Palmer's mailing address for her SSI benefit checks was changed to 1426 F street from Palmer's previous address in Redding.  Defendant forged Palmer's endorsement on SSI and other checks totaling nearly $7000.  She also forged Palmer's signature on

---

[10]  In October 1985, December 1985, January 1986, February 1986, April 1986, June 1986, July 1986, August 1986, September 1986, November 1986, December 1986, January 1987, February 1987, March 1987, June 1987, July 1987, August 1987, September 1987 [sic], October 1987, September 1987, December 1987, January 1998, March 1988, April 1988, May 1988, June 1988, July 1988, August 1988, September and November 1988, she filled prescriptions for flurazepam.  In July 1986, September 1986, November 1986 and February 1987, defendant filled two prescriptions for flurazepam at two different pharmacies.

9

applications for HEAP and RAP benefits and for a Renter's Credit in 1987 and 1988.

Sometime in 1986, defendant asked McCauley to dig a hole in the front yard. He dug a two-foot deep hole that was two feet wide. The day after he dug the hole, Ordorica asked him to "fill it up again" and McCauley put the loose dirt back into the hole. In November 1988, Palmer's body was discovered buried in a shallow hole in defendant's front yard.

**[Leona Carpenter]**

Seventy-eight-year-old Leona Carpenter came to live with defendant at 1426 F Street in December 1986. Defendant and Carpenter had apparently been acquainted prior to Carpenter coming to reside at 1426 F Street. Carpenter, who had been an SSI beneficiary since 1974, was a chronic user and abuser of alcohol, codeine and prescription sedatives, including flurazepam. In September 1986, Carpenter had been hospitalized in a coma which was thought to be "a Dalmane [flurazepam] overdose" following her consumption of 28 capsules of flurazepam three days after obtaining a flurazepam prescription. At the time, it appeared that Carpenter no longer wished to live. On October 21, 1986, defendant summoned a notary to Carpenter's hospital room and had Carpenter's signature on a "power of attorney" document notarized. Defendant cashed Carpenter's October 31, 1986 SSI check. She signed the check "Dorothea Puente for Leona Carpenter." In November 1986, defendant offered to take care of Carpenter when Carpenter was released from the hospital. Defendant asserted that she had been friends with Carpenter for 29 years. Carpenter's mailing address for correspondence regarding her SSI benefits was changed to 1426 F Street in November 1986. The checks totaled more than $7000. Defendant also forged Carpenter's signature on applications for RAP benefits and Renter's Credits filed in Carpenter's name in 1987 for the year 1986 and in 1988 for the year 1987.

Carpenter lived at 1426 F Street for two weeks in December 1986, but then she returned to the hospital. In late February 1987, Carpenter was discharged from the hospital and returned to 1426 F Street. She was very ill when she arrived and looked "close to death."[11] She "moaned and groaned constantly" and frequently demanded that defendant bring her medication. Defendant gave her pills when asked for them. A few weeks after Carpenter arrived, she disappeared. Defendant told another tenant that Carpenter's daughter had taken her away. A week later, a woman identifying herself as Carpenter's daughter came looking for Carpenter. Defendant was not home at the time. When told of this, defendant said that she had taken Carpenter to a nursing home.

In April or May of 1987, defendant summoned a plumber to investigate "some water bubbling up" in the southeastern corner of her yard. Investigation of this problem required the plumber to have the area excavated. A two feet deep, three or four feet wide hole was dug about three feet from the rear of the property and left open overnight. The plumber determined that the sewer line was "plugged up." In November 1988, Carpenter's body was found buried in a two-foot deep hole in the southeastern corner of defendant's yard.

---

[11] Carol Westbrook was another of defendant's tenants. She testified that defendant told her this person's name was "Betty." However, the prosecutor argued, and the evidence reflected, that the person who arrived at 1426 F Street during Westbrook's tenancy was in fact Carpenter.

**[James Gallop]**

Sixty-two-year-old James Gallop moved into 1426 F Street in February 1987 following a period of hospitalization after he had undergone surgery. Gallop had an inoperable non-malignant brain tumor which did not pose an immediate threat of death. He was very frail, and he had a patch over one eye which was partially closed. Gallop was an alcoholic who drank at least a six-pack of beer each day and had been smoking two or three packs of cigarettes a day for fifty years. He had been receiving SSA and SSI benefits since 1984. The address to which his benefit checks were sent had been changed to 1426 F Street by March 1987. Defendant forged Gallop's signature on checks totaling more than $2000. She also forged Gallop's signature on applications for HEAP and RAP benefits and for a Renter's Credit in 1987 and 1988.

Defendant took charge of giving Gallop his medications during his convalescence. Gallop obtained a prescription for a month's supply of flurazepam in May 1987. He was also prescribed phenytoin (also know as Dilantin). On June 15, Gallop's physician's nurse telephoned to inform Gallop of the results of some medical tests. The nurse spoke with defendant and told her that the treatment Gallop had received had failed to shrink his brain tumor. At some point, Gallop and defendant had "a disagreement about his SSI checks" because Gallop "did not want [defendant] to be his payee." On July 20, Gallop underwent a barium enema which showed that there was a potentially malignant four-centimeter tumor in his colon. Gallop and his physician discussed the test results the next day, and Gallop agreed to undergo further testing. When the physician failed to hear from Gallop after that, his office attempted to contact him. Defendant thereafter called the physician's office and said that Gallop had gone to Los Angeles for an indefinite period. Two weeks after defendant's disagreement with Gallop, defendant told an acquaintance of Gallop who asked about him that "he just vanished in the middle of the night." Defendant told a friend of hers that Gallop had died, and she had had his body cremated because he had no family. In November 1988, Gallop's body was found buried under a gazebo in defendant's yard.

In July 1987, one of defendant's tenants was found "unresponsive" in front of her residence. Defendant called the police, and the tenant was taken to the hospital where he died of natural causes.

In the fall of 1987, defendant contacted Peggy Nickerson who worked for a program which located homes for elderly homeless individuals. Defendant suggested that 1426 F Street might be an appropriate placement for such individuals. Between the fall of 1987 and August 1988, Nickerson placed 19 individuals at 1426 F Street.[12] Nickerson believed that 1526 F Street made an attractive placement because defendant was willing to accept "difficult" tenants who did not have any money.

**[Vera Faye Martin]**

On October 2, 1987, Nickerson placed 61-year-old Vera Faye Martin at 1426 F Street. Martin was a "verbally abusive" long-time alcoholic who had been receiving SSI payments since 1974.[13] Defendant forged Martin's endorsement signature on a number of checks for a total of more than $7000 beginning with an October 5, 1987

---

[12] Nickerson was unaware of defendant's criminal history.

[13] On numerous occasions, her blood alcohol level had been tested and found to exceed .20 and even .30. While a non-alcoholic would probably be unconscious at such high blood alcohol levels, an alcoholic may be able to withstand a blood alcohol level of .60 or higher. Martin had a history of blackouts.

United States District Court

For the Northern District of California

endorsement on Martin's October 1987 SSI check.  Defendant also forged Martin's signature on applications for HEAP and RAP benefits and for a Renter's Credit in 1987 and 1988.  Martin had little contact with her children, but she regularly contacted her daughter and son each year on their birthdays.  Martin did not call her daughter on her daughter's October 19, 1987 birthday nor did she contact her son on his November 11, 1987 birthday [sic].  In December 1987, Martin's SSI checks began being sent to 1426 F Street.  In November 1988, Martin's body was found buried under a metal shed in defendant's yard.

Beginning in the fall of 1987, defendant hired a total of 11 different inmates, who were housed at a Sacramento minimum security "halfway house" facility pending their parole, to do work in the house and yard at 1426 F Street.[14]  These inmates were not supervised by correctional officers while they were working at 1426 F Street.  Defendant ordered and received a large number of 90-pound bags of ready-mix cement during this period and made more than a dozen visits to a local building supply store where she purchased plastic ground covers, carpeting and cement.  Defendant told the inmates she hired that she wanted to bury garbage in holes in the yard and that they were looking for sewer pipes.  Defendant directed all of this work and paid these inmates $20 in cash for each day they worked.  The inmates took the position that "[a]s long as she paid us, we never questioned anything that she told us to do."  McCauley acted as her "overseer" and, at defendant's direction, supervised some of this work.  Some of the holes dug by these inmates to the east of the house were left open for a week or two.  Defendant directed these inmates to dig "some trenches and some holes on the side of the house and in the back yard."  In the fall of 1987, two inmates and McCauley built a metal shed in the eastern portion of the yard at 1426 F Street.  The ground underneath this shed was very soft.

**[Dorothy Miller]**
On October 21, 1987, Nickerson placed 65-year-old Dorothy Miller at 1426 F Street.  Miller lived in the upstairs flat in a room off the kitchen.  Miller was an "extremely paranoid" and "combative" alcoholic who had a history of suicide attempts and violent outbursts.  She had been receiving SSA benefits since 1986.  Miller also was eligible for a Veteran's Administration pension of $517 a month based on her psychiatric disability.  Miller had never been prescribed flurazepam or carbamazepine, but she had been prescribed Valium in the past.  On October 22, Miller was cited for petty theft after she was seen shoplifting two packs of cigarettes.  The following week, Miller came to Nickerson's office and asked for help in dealing with this citation.  On October 23, 1987, Miller was seen by a physician for gynecological problems.  A subsequent appointment was scheduled for November 13.

Miller's SSA payments were sent to a representative payee in Shasta County until November 1987.  In late October 1987, defendant introduced Ordorica to Miller and asked him to act as Miller's "payee."  Ordorica agreed to do so, and he and Miller went to the Social Security office to sign the appropriate papers.  In early November 1987, Ordorica became Miller's representative payee.  Miller's SSA checks where thereafter sent to 1426 F Street.  A few weeks after arriving at 1426 F Street, Miller disappeared.  Defendant told one of her other tenants that Miller had been arrested for shoplifting "and she couldn't put up with her no more, and she throwed [sic] her out."  She also told someone that she had had a nurse come and take Miller away.  Defendant told Ordorica that Miller was in a hospital in Martinez

---

[14]  These state prison inmates were permitted to live in a minimum security facility in Sacramento, visit their families and work in the community once they were within 120 days of being paroled.

United States District Court

For the Northern District of California

to undergo treatment for her alcoholism.  Miller did not show up for her scheduled November 13 doctor's appointment.

Defendant thereafter made a practice of giving Miller's SSA check to Ordorica each month as partial payment of rent.  Beginning in December 1987, Miller's pension checks also began coming to 1426 F Street.  Defendant also applied these checks to her rent by giving them to Ordorica.  These two checks together paid defendant's rent every month thereafter.  On October 31, 1987, defendant forged Miller's signature on an application for HEAP benefits.  Defendant also forged Miller's signature on an application for RAP benefits dated October 29, 1987 and May 1988.  An application for a Renter's Credit was filed in Miller's name in December 1987.  Defendant forged Miller's endorsement signature on numerous checks for a total of more than $11000 beginning in October 1987.

Sometime in the fall of 1987, defendant had one of the hired inmates clean the floor in an upstairs bedroom off of the kitchen.  The inmate had observed, prior to this, that this bedroom was occupied by a woman named Dorothy.  "Dorothy" was not present when he was asked to clean the floor.  The floor was "real dirty" and it looked "like somebody throw up or something . . . ."  On another occasion, another inmate was directed to remove some carpeting from the same bedroom.  He noticed that this carpeting had a large stain on it.  On November 20, 1987, defendant summoned a professional carpet cleaner to remove a large "pile of foul smelling slime" from the center of a carpet in an upstairs bedroom off of the kitchen.  In the bedroom in which this "slime" was located, the bed had been "stripped down" as if someone had moved out.  Defendant told one of her tenants that this bedroom was "haunted."

Defendant directed an inmate to dig a three or four-foot deep, four-foot wide hole between the metal shed and the gazebo "for trash," and, after he had dug the hole, he left it open.  A couple of weeks later, the inmate noticed that the hole had been filled in and concrete laid over it.  In November 1988, Miller's remains were discovered buried under some concrete in defendant's yard.

**[Benjamin Fink]**

On March 9, 1988, Nickerson placed Benjamin Fink at 1426 F Street.  Fink was a 55-year-old chronic alcoholic who "lived to drink" and "had some mobility problems" as a result of a 1980 automobile accident which caused him to use a cane.  Fink had been receiving SSI benefits since 1980.  Fink was known to show up in hospital emergency rooms with minor injuries and in a state of extreme intoxication.[15]  Fink was also known to check out of the hospital against medical advice.  A few days before he came to live at 1426 F Street, Fink was disqualified as a plasma donor on grounds of "general feebleness."  Fink resided at 1426 F Street for about two months.  During this period of time, Fink's brother visited Fink on basically a weekly basis for about six weeks.  Fink's brother last saw Fink in late April.  Fink disappeared at the end of April.  The day Fink disappeared he was under the influence of alcohol, and defendant told another tenant "that she was going to take Ben upstairs and make him feel better."  About four days later, this tenant smelled a bad odor which he identified as the "[s]mell of death" from "a dead body" that had been dead for at least two days emanating from the room off of the upstairs flat's kitchen.  Defendant told this tenant that the sewer had backed up.

---

[15]  On one of these occasions, his blood alcohol level was tested and found to be .456, a potentially lethal level.  This blood alcohol level translates to the ingestion of 23 drinks in a one-hour period.  On several other occasions, his blood alcohol level was about .25 and even above .35.  However, alcoholics can often tolerate very high blood alcohol levels which would be lethal to non-alcoholics.

13

Fink's SSI benefit checks continued to come to 1426 F Street after his disappearance, and defendant forged his endorsement signature on $6000 worth of these checks. She also forged his signature on applications for HEAP and RAP benefits and for Renter's Credit in 1998. Defendant subsequently told the police that Fink had gone "back to Marysville" in the summer of 1988 after she asked him to leave and "not to ever come back on the property." She said she told Fink to move "because I couldn't take his falling down drinking any more."

At some point, defendant told her friend Trujillo that "she had bodies down in the yard and not to be going down there." Defendant once stated to Trujillo that "she had killed people and that they were buried in her yard." Trujillo once observed defendant empty a white substance out of some pink pill capsules into a drink defendant was fixing for McCauley. Defendant told Trujillo that she was doing this to "knock him out." Defendant took this drink to McCauley. Thirty minutes later, defendant went into McCauley's room, went through his pockets and "pulled out some money." Trujillo observed that McCauley was unconscious. On another occasion, Trujillo went to 1426 F Street for dinner right after her release from a prison stay. Defendant gave her a plate of food and a drink. The next thing Trujillo remembered was defendant "putting pills in my mouth." Trujillo woke up the next day in jail for violating her parole. In April 1988, Trujillo told police that defendant "was killing people, and she had dead bodies." The police took no action on this information. Trujillo did not say anything about bodies being buried in defendant's yard.

On April 29, defendant received 12 bags of cement. In June 1988, defendant had inmates dig a hole right outside the door to the metal shed that had been erected in the eastern portion of the yard the previous fall. The door to the metal shed faced the rear fence. Defendant instructed them to dig a five foot deep L-shaped hole, and they did so. This hole was five feet long and six feet wide, and it extended to five feet in front of the door to the metal shed. A day or two later, the inmates filled in the hole. When they filled it in, they noticed a piece of carpet in the hole. Defendant said she had put some garbage in the hole to get rid of it. Later that month, defendant had two inmates pour concrete just in front of the door to the metal shed and, a few days later, about five feet in front of that same door. She also had two inmates lay cement underneath a gazebo in the yard. When they were preparing the ground to lay the cement, one of these men smelled an extremely foul odor coming from the ground in this location. In November 1988, Fink's body was found buried just in front of the metal shed.

**[Alberto "Bert" Gonzales Montoya]**
Alberto "Bert" Gonzales Montoya had lived in a detoxification center for five years before he arrived at 1426 F Street in early February 1988. 51-year-old Montoya drank whenever he could obtain alcohol, heard "voices" and would engage in audible conversations with these "voices." Montoya told others that the voices "were sprits from the dead" and that one of the voices was his deceased father who "would tell him to die or to kill himself." He was a very innocent, passive person who generally did not speak unless someone spoke to him. In April 1988, Montoya returned to the detoxication center complaining about his medications. The next day, he willingly returned to 1426 F Street.

Montoya became eligible for SSI benefits in January 1988 based on a diagnosis of "probable chronic schizophrenia." In March 1988, an application was filed requesting that defendant be designated Montoya's representative payee. On the application, defendant identified herself as Montoya's "cousin." The request was granted. Montoya's first $637 SSI check was sent to defendant in June 1988. In July 1988, a retroactive payment of $1,598.97 was sent to defendant for Montoya's

14

SSI benefits for the period between January and June 1988.  Montoya's SSI checks continued thereafter to be sent to defendant at 1426 F Street.  More than $2000 was disbursed to defendant on behalf of Montoya.

Defendant took care of Montoya and made him wash, shave, eat and wear clean clothes.  Montoya would take medication with his evening meal.  This medication would be in front of his plate when he sat down to eat.  Montoya had been prescribed several antipsychotic and antidepressant medications including loxapine and amitriptyline.  Montoya had diabetes for which he was prescribed Micronase.[16] In addition, he had been prescribed flurazepam and diphenhydramine.  He received his last prescription for flurazepam on July 11, 1988.  Montoya habitually drank "a couple of beers and [ate] two or three burritos" at a bar near 1426 F Street.  During the summer of 1988, defendants [sic] gave the bar owner between $60 and $85 each month to pay for Montoya's beers and burritos.  Montoya did not appear to become intoxicated from these beers.  At the end of July, Montoya emptied a number of full cans of soda, recycled the cans and used the money to get very drunk.  Defendant became "quite distraught" and upset when she learned of this.

On August 6 or August 10, Montoya went to the bar and had a beer and a burrito.  Montoya was leaning against a bar stool when he got up and fell to the ground.  The bar owner called 1426 F Street, but defendant was not home.  He talked to a man at 1426 F Street and told him that Montoya had passed out.  Two men came to the bar and carried Montoya back to 1426 F Street.  Defendant arrived home a few minutes later and "she seemed pretty concerned with what was going on with Bert."  Montoya never returned to the bar.  On August 24, a neighbor saw Montoya drinking from a bottle in the neighborhood.  Montoya was never seen again.  At the end of August, Montoya's roommate saw another man clearing Montoya's clothes out of the closet.  Montoya failed to keep a medical appointment on August 29, 1988.  Less than a day after Montoya disappeared, defendant told another tenant that she had sent Montoya to Mexico to visit her relatives.  She told the same story to several people.

Defendant continued to tell people that she was in contact with Montoya in Mexico, that he was enjoying himself there and that he would be returning shortly.  Defendant had been forging Montoya's signature on checks and appropriating his monthly food stamps allotments since February 1988.  She also forged his signature on applications for HEAP and RAP benefits and for a Renter's Credit.  In November 1988, Montoya's decomposed body was found buried in defendant's yard.

Defendant had begun cashing checks at a bar near 1426 F Street in 1987.  Defendant cashed a series of checks at this bar between June 1987 and June 1988 drawn on Carpenter's checking account which defendant signed "Dorothea Puente attorney in fact."  Between February and November of 1988, she cashed many SSI and general assistance checks made out to individuals other than herself at this bar.  On many of these checks defendant had forged the endorsements.  A few days after the first of each month, defendant would cash a "group" of four to six checks for a total amount of around $3000.  The bar owner would take defendant's checks to the bank and obtain cash for defendant.  Defendant told the bar owner that she wanted to cash checks in this manner because "she couldn't show that she had that much

---

[16]  Montoya was seen by a physician on July 29, 1988 for a blood sugar test.  Because Montoya's blood sugar was low, the physician halved the level of Micronase which Montoya was supposed to take.  Alcohol is one thing which can cause low blood sugar in an individual who is taking Micronase.  Montoya failed to keep a blood sugar appointment with this physician on August 29, 1988.

income." She also claimed that she had the authority to cash those checks even though they were made out to others. In August or September 1988, defendant cashed state benefit checks made out to Carpenter, Gallop and Miller at this bar. She also cashed an SSI check made out to Gallop. In November of 1988, defendant cashed SSI checks made out to Palmer, Fink, Martin, Montoya, and Miller at this bar. Defendant also forged the signatures of others of her tenants and her friends on numerous government checks and applications for state benefits.

In July or August 1988, defendant received 65 bags of cement. In August 1988, Nickerson stopped placing individuals at 1426 F Street after she overheard an argument between defendant and one of the men Nickerson had placed at 1426 F Street. Nickerson got the impression that defendant was "burned out," and she decided that defendant needed "a break."

On September 21, 1988, defendant sought medical treatment and identified herself as Dorothy Miller. She asked the physician to refill several prescriptions including a prescription for "Dalmane" which she said had been prescribed for her in Mexico. The physician did not prescribe flurazepam for her, but instead prescribed an antihistamine to help her sleep.

Two social workers who had been working with Montoya tried to contact Montoya through defendant in September and October 1988. Defendant told them that Montoya was still in Mexico. One of the social workers told defendant that Montoya needed to be back in the country by November 1 so as not to endanger his social security benefits. Defendant assured her that Montoya would be back at her residence on Novemebr 1. On Monday, November 1, these social workers went to 1426 F Street to see if Montoya was there. Montoya was not present, but defendant told them that she was going to pick him up in Mexico, and he would be back on Saturday. One of the social workers told defendant that she would be back on Monday to see Montoya.

In November 1988, defendant gave "a couple of sleepin' pills" to one of her tenants at his request. These "pills" turned out to be flurazepam. On November 7, 1988, a police officer spoke with one of the social workers and then came to 1426 F Street inquiring about Montoya. Defendant told the police officer that Montoya had been in Mexico visiting relatives for two months and had returned from Mexico just three days earlier. According to defendant, Montoya's brother-in-law had taken Montoya away the pevious day. Defendant told the officer that he could check with the other residents at 1426 F Street to confirm her story. Defendant had asked one of her tenants to lie to the police and say that he had seen Montoya a few days earlier. She said she would "make it worth [his] while" if he lied for her. The officer spoke to two of the residents. The resident defendant had asked to lie for her told the police this lie, but he showed the police officer a piece of paper on which he had written that he was lying. He later met the police officer a couple of blocks away and told him that he had not seen Montoya recently. Defendant asked Donald Anthony, one of the inmates who had been working in her yard, to call the soical worker who had been looking for Montoya and tell her that he was Montoya's brother-in-law and was taking Montoya to Utah. Anthony did so. Defendant also had Anthony mail a letter to the social worker from Reno, Nevada which contained the same story. When the police arrived and began digging in defendant's yard on November 11, 1988, defendant told Anthony to tell the police that "I hadn't laid cement there and that I only worked outside."

The social worker received a telephone call from a man calling himself "Michel Obergone" and claiming to be Montoya's brother-in-law. This man told the social worker that he had picked up Montoya at 1426 F Street and was taking him to

United States District Court

For the Northern District of California

"Shreveport, Utah" to live with his family. The social worker's suspicions were aroused by obvious inconsistencies in this man story. She asked to speak with Montoya. The man said Montoya was "under the weather" and he refused to give the social worker any number at which he cold be reached. After this conversation concluded, the social worker retrieved her phone messages and listened to one from the same man in which he first identified himself as Donald Anthony and then as "Michel Obergone." The message gave a similar story about Montoya's whereabouts. The social worker called defendant and related this to her. Defendant said that Montoya's brother-in-law had taken Montoya away with him. The social worker told defendant that she was going to call the police. On November 10 the social worker received a letter which purported to be from "Michel Obergone." She notified the police and, the next morning, she delivered this letter to Detective John Cabrera of the Sacramento Police Department.

On November 11, at 9:15 a.m., Cabrera, Detective Terry Brown and defendants's parole[17] officer Jim Wilson went to 1426 F Street to investigate Montoya's disappearance. They spoke with defendant, and she repeated the story that she had told the social worker about Montoya being taken away by his brother-in-law. They also asked defendant whether she had had a tenant named Ben. She said that Ben Fink had lived there until four months earlier when she had thrown him out for getting drunk. Wilson discussed with defendant "a possible violation of her parole because of having borders and being the payee." He told defendant that he "would write it up as a violation." Cabrera asked defendant if they could look around the house and dig in her yard. Defendant allowed them to do so. In defendant's bedroom, Cabrera found a vial "crammed full of blue capsules" and an empty vial with the name "Dorothy Miller" on it. Cabrera asked defendant about the vial with Miller's name on it, and defendant said that Miller was a relative. The three men thereafter began digging in the yard. First, they found some bones and then a shoe with a foot in it buried in the yard. They stopped digging and called the coroner's office. The police secured the area.

Defendant went to the police station and was interviewed and then returned to her home. She told the police that she had no problem whatsoever with them digging in her yard. The next morning, November 12, digging resumed with numerous personnel involved including an anthropologist. Defendant sent one of her tenants to tell Cabrera, who was in the yard, that she wished to speak with him. Defendant asked Cabrera "am I under arrest?" He said "no." She said she was "nervous" and wanted to go over to the Clarion Hotel to have a cup of coffee with her nephew. Cabrera told her "fine." Cabrera escorted defendant away from 1426 F Street. The digging continued, and Cabrera discovered a body about 20 minutes later.

In three days of digging on November 12, 13, and 14, seven bodies were discovered buried in the yard at 1426 F Street. The house faces north toward F Street. Six of the bodies were buried along the eastern edge of the yard, while one was buried in the western portion of the front yard. Montoya's body was found in the southeast corner of the yard. Carpenter's body was adjacent to Montoya's body buried just two feet deep. Fink's body was found buried directly in front of the metal shed. Martin's body was found buried just an inch or two under the ground beneath the metal shed. Miller's remains were discovered under some concrete that had been laid around some rose bushes. Gallop's body was buried under a gazebo. None of these six bodies showed any sign of trauma. Most of Palmer's body was

---

[17] Defendant's parole officer had apparently never met defendant before.

17

United States District Court

For the Northern District of California

found buried in a very shallow hole in the front .  Palmer's head, hands and lower legs had been severed from her body and were not found.

Carpenter's body was found in a fetal position.  Her body had clothes on it, and her feet were in brown suede shoes with one inch heels.  Her body was in an "advanced state of decomposition," and she had been dead "a number of months."  There was no evidence of trauma to her body.  The bones in her neck were intact.  The cause of her death could not be determined.  No blood remained in her body, and her body was so decomposed that her liver could not be found.  Toxicology reports revealed the presence of codeine, diazepam, flurazepam and the metabolites of flurazepam[18] in a sample taken from Carpenter's brain tissue.

Diazepam, also know as Valium, is, like flurazepam, a hypnotic sedative used to induce sleep, but it can be lethal if enough is consumed.  Codeine is an opiate which is used for pain relief, but it can be lethal if sufficient quantity is consumed to depress a person's central nervous system and cause the person to stop breathing.  All three are prescription drugs.   A less than lethal dose of these three drugs might be lethal if consumed in conjunction with alcohol.  The levels of these three drugs in Carpenter's brain tissue sample were low, and they did not appear to be lethal levels.[19]  However, there was no way of knowing whether the levels of these drugs in the tissue sample were representative of the levels of these drugs in her body at the time of her death.  This is because science has not yet determined whether the concentrations of such substances increases or decreases after death as a result of the loss of bodily fluids.  A massive dose of flurazepam was ruled out as a cause of Carpenter's death.

Miller's body was found enclosed in four layers of fabric.  Some of the fabric had been knotted and tied with twine.  These layers were composed of sheets, a quilt and plastic.  Her body was in a fetal position.  She was wearing two blouses, a long slip or dress, stockings and underwear.  There were no shoes on her feet.  Her right arm had been taped to her abdomen with a large piece of duct tape which ran around her knees and legs.  There was no evidence of trauma to Miller's body.  Tissue samples from Miller's brain and liver were collected and tested.  Testing of these samples revealed the presence of carbamazepine, also known as Tegretol, flurazepam and the metabolites of flurazepam.[20]  Carbamazepine is an anticonvulsant anti-seizure medication.  The cause of Miller's death was undetermined.

Fink's body was clad in only boxer shorts and socks, and it was wrapped in two layers of plastic knotted bedspread.  Duct tape had been used to secure one of the layers of plastic.  Fink's body was spread out.  There was a square two-foot wide blue absorbent pad over Fink's face and upper chest, and another such pad between his upper legs.  A fabric sheet was also found between Finks's legs, and a second

---

[18]  Flurazepam has three "metabolites."  Flurazepam is the "parent drug" to flurazepamaldehyde which means that, as flurazepam is metabolized, it becomes flurazepamaldehyde.  [This] is then metabolied into hydroxyethylflurazepam which is metabolized into desalkylflurazepam.

[19]  Flurazepam was found at a level of .04 miligrams per kilogram (mg/kg), hydroxyethylflurazepam at .13 mg/kg and desalkylflurazepam at . 84 mg/kg.

[20]  Carbamazepine was present in the brain tissue sample at a level of 54 mg/kg and in the liver sample at a level of 68 mg/kg.  The flurazepam level was .03 mg/kg in the brain and .07 mg/kg in the liver.  Desalkylflurazepam was present in the brain at a level of .97 mg/kg and in the liver at a level of .83 mg/kg.  Hydroxyethylflurazepam was present in the brain at a level of .06 mg/kg and in the liver at a level of .09 mg/kg.

sheet was found wadded over his abdomen.  There was no evidence of any trauma to Fink's body, and the cause of death was "undetermined."  As there was no blood in the body, tissue samples from Fink's brain and liver were collected and submitted for toxicological testing.  This testing revealed the presence of amitriptyline, its metabolite nortriptyline, loxapine and flurazepam and its metabolites.[21]

Palmer's body was wearing a sleeveless nightgown or dress and another "day dress" over it.  Her remains were inside a knotted sheet.  Her hands were missing from her wrist, and her legs had been cut off above the kneecaps.  Her head had been removed at the neck.  It could not be determined whether these body parts had been severed all at one time or "before death or after death."  These body parts had been removed with a "clean cut" most likely by a saw or possibly an ax or very heavy cleaver.  If these parts had been removed prior to death, it would have produced "massive" bleeding.  Even up to two days after death, the removal of these parts would have produced a "large amount" of blood.  The nightgown on Palmer's body had no apparent blood on it.  There was no evidence of any trauma to Palmer's body.  The cause of death was undetermined.  As there was no blood in the body, a tissue sample was removed from Palmer's liver for toxicological testing.  Testing revealed the presence of Doxylamine, an over-the-counter antihistamine/sleeping aid, Haloperidol, an antipsychotic, and flurazepam and its metabolites.[22]

Gallop's remains were also wrapped in layers of knotted bedding.  One layer had "large stitches" of red string or twine binding the edges of the fabric together over the front of the remains.  Gallop was wearing only a short sleeved shirt and socks.  He was not wearing underwear.  A tie was wrapped tightly three times and knotted around his lower left leg and thigh so as to pull the leg back against the thigh.  Another piece of fabric was similarly wrapped around Gallop's right leg and thigh.  A belt was wrapped around his right ankle and right thigh.  There was no evidence of trauma to his body.  Because no blood remained in the body, tissue samples from Gallop's brain and liver were collected for toxicological testing.  Amitriptyline, nortriptyline, phenytoin and flurazepam and its metabolites were found in his tissue.[23]  Phenytoin is an anticonvulsant drug, also known as Dilantin, which is given to prevent seizures.  Amitriptyline is an antidepressant.  Nortriptyline is a metabolite of amitriptyline.  The physician who performed the autopsy on Gallop's remains concluded that the cause of death was "undetermined."

Martin's body was enclosed in layers of knotted sheets and tied with twine.  The upper part of Martin's body was covered by a large piece of thick blue absorbent paper.  A similar piece of paper was tied around and between Martin's legs and knotted in the front between her knees.  Martin's body was clad in a dress, bra and pantyhose.  There was a watch on her wrist, a ring by her hand and earrings in the

---

[21] No flurazepam was found in Fink's brain tissue, but .04 mg/kg was found in his liver tissue.  Desalkylflurazepam was found in the brain at a level of 1.8 mg/kg and in the liver at .66 mg/kg and in the liver at 1.3 mg/kg.

[22] Flurazepam was found in her liver at a level of .15 mg/kg, desalkyllflurazepam at 1.28 mg/kg and hydroxyethylflurazepam at . 84 mg/kg.

[23] Flurazepam was found in his brain tissue at a concentration of .29 mg/kg and in his liver tissue at a level of .36 mg/kg.  Desalkylflurazepam was found at a level of .9 mg/kg in the brain and 5.97 in the liver. mg/kg and in the liver at a level of 1.3 mg/kg.  Hydroxyethylflurazepam was found at a level of .19 mg/kg in the brain and 7.73 mg/kg in the liver.

United States District Court

For the Northern District of California

vicinity of her ears.[24]  She was not wearing shoes.  There was no sign of trauma to Martin's body.  Because no blood remained in the body, tissue samples from Martin's brain and liver were collected and submitted for toxicological testing. These tests revealed flurazepam and its metabolites.[25]  The physician who conducted the autopsy concluded that the cause of death was "undetermined."

Montoya's body was fully clothed except for shoes, and it was wrapped in many layers of knotted bedding and plastic and secured with duct tape.  One layer, a blanket, had been stitched together with large stitches of coarse red thread or twine. There were no signs of trauma to Montoya's body.  His neck bones were intact.  He had been dead for "weeks to months," and his body had remained unburied above the ground for one to six days.[26]  Brain and liver tissue samples were collected and preserved for toxicological testing.  Testing revealed the presence of loxapine, flurazepam and its metabolites, diphenhydramine, amitriptyline and carbamazepine.[27]  All of these drugs had been prescribed to Montoya except for carbamazepine.  Amitriptyline is an antidepressant also known as Elavil.  Loxapine is an antipsychotic medication.  Diphenhydramine is an antihistamine also known as Benadryl.

It was estimated that each of the bodies found buried in the yard at 1426 F Street had been in the ground for a minimum of several weeks and a maximum two years. The coroner classified the cause of death as "undetermined" for each of the seven bodies buried.

Shortly after defendant left 1426 F Street on the morning of November 12, defendant and McCauley arrived at a bar in West Sacramento.  McCauley left about 15 minutes later.  An hour or so later, defendant asked the bar manager to call her a cab.  A cab arrived, and defendant had the driver taker her to Stockton.  The fare for this trip was $60.  A warrant was issued for defendant's arrest on November 14, 1988.  On November 16, 1988, defendant approached an elderly man in a Los Angeles bar, bought him a drink and engaged him in conversation about the amount of his social security disability checks.  She told him that he should be getting bigger checks, offered to cook Thanksgiving dinner for him and suggested that she move in with him.  Defendant told this man that her name was "Donna Johanson" and gave him the phone number and room number of the motel where she was staying.  This man later realized that he had seen a picture of defendant on the television news.  He spoke with the police and told them where defendant was staying.  Defendant was located by police in a downtown Los Angeles motel room and arrested.  She registered at the motel under the name  "Donna Johanson" had given a San Francisco home address.  At the time of her arrest, she had $3,042.25 in cash in her purse.

---

[24]  The movement of the ring from her finger and earrings from her ears was attributed to decomposition.

[25]  Flurazepam was found at a level of 1.5 mg/kg and 1.6 mg/kg in the liver; desalkylflurazepam at 1.6 mg/kg in the brain and .13 mg/kg in the liver; hydroxyethylflurazepam at .35 mg/kg in the brain and .75 mg/kg in the liver.

[26]  This was determined by the presence of maggots and their eggs on Montoya's remains.

[27]  The flurazepam level in his brain tissue was .95 mg/kg and the level in his liver tissue at a level of .88 mg/kg.  The desalkylflurazepam level was .41mg/kg in the brain and .35 in the liver. mg/kg and in the liver at a level of 1.3 mg/kg.  The hydroxyethylflurazepam level was .09 mg/kg in the brain and .06 mg/kg in the liver.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4

The house at 1426 F Street was thoroughly searched. Identification, mail and prescription medication belonging to the decedents were found there. Two identification cards issued in October 1986 and June 1988 bearing the name "Betty Palmer" and defendant's photo were found in the residence. A number of empty blue and red halves of gelatin capsules were found in a dresser drawer in defendant's bedroom. A vial containing flurazepam prescribed to defendant was also found in the residence.

5
6
7
8

Defendant was charged by information with nine counts of murder (Pen. Code, §187), and it was specially alleged that she had committed multiple murders (Pen. Code, § 190.2, subd. (a)(3)). The information alleged that defendant had "willfully, unlawfully, and feloniously and with malice aforethought murder[ed]" the victims. The trial was removed to Monterey County from Sacramento County after the court granted defendant's change of venue motion and the parties stipulated to the selection of Monterey County.

9

## II.  The Trial

10
11
12
13
14
15
16
17
18
19

**[Defense Case]**
Defendant's defense was essentially that she might be responsible for burying bodies in the yard, but she could not be found guilty of killing the victims because "you can't exclude natural death" and these victims "were old and decrepit and had a lot of problems." She claimed that there was no evidence that the alleged victims had died as a result of a "criminal agency." Defendant also presented evidence intended to show that she did not stand to gain financially from the deaths of the decedents. She asserted that she had not profited from the checks she had forged, and, since she had access to these checks before the decedents died, there was "no reason" for her to kill them. However, this evidence was based on the assumption that defendant fed and housed at least five people continually from October 1985 to December 1988 and that her food budget was comparable to that at a board and care facility.[28] Defendant's toxicology expert testified that the presence of flurazepam in the decedents' tissues did not indicate that flurazepam had been recently ingested. The defense argument to the jury was that defendant had stolen money from the decedents but had not killed them. Defendant asserted that it was reasonable to conclude that each of these individuals had died a natural death or, in the case of Munroe, had committed suicide.

20
21
22
23
24
25
26
27

**[Trial Court's Instructions]**
The trial court instructed on numerous theories of liability for first and second degree murder. First, the jury was instructed on "deliberate premeditated" first degree murder. Second, it was instructed on first degree murder "by means of poison." The jury was also instructed on "reckless heart" second degree murder and second degree felony murder. Finally, the jury was instructed on a theory of failure to provide necessary medical care which could have been used to support first or second degree murder or involuntary manslaughter. As to Fink only, the jury was instructed on voluntary manslaughter. During its deliberations, on August 25, 1983, the jury asked for "clarification" of the instructions on cross-admissibility of other crimes/other counts evidence and additional instructions on "poison." On the morning of August 26, the trial judge gave a lengthy response to this inquiry. Later that day, the jury informed the judge that "[w]e have reached the verdicts we will be able to reach." The jury returned verdicts on only three of the nine counts. It found defendant guilty of first degree murder of Fink and Miller and of second degree

28

---

[28] Defendant did not begin renting rooms on the lower floor of the house until May 1987. The upper floor had only three bedrooms, and defendant lived in one of these bedrooms.

1    murder of Carpenter. The jury also found the multiple murder special circumstance
2    allegation true. The jury was unable to reach verdicts on the remaining counts, and
     the court declared a mistrial on those counts.

3    (Pet'r Ex. A at 2-35.)

4                              **STANDARD OF REVIEW**

5           Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court

6    may grant a petition challenging a state conviction or sentence on the basis of a claim that was

7    "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1)

8    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

9    established Federal law, as determined by the Supreme Court of the United States; or   (2) resulted

10   in a decision that was based on an unreasonable determination of the facts in light of the evidence

11   presented in the state court proceeding." 28 U.S.C. § 2254(d). Courts are not required to address

12   the merits of a particular claim, but may simply deny a habeas application on the ground that relief

13   is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U. S. 63, 70-73 (2003) (overruling

14   *Van Tran v. Lindsey*, 212 F.3d 1143, 1154-55 (9th Cir. 2000), in which the Ninth Circuit required

15   district courts to review state court decisions for error before determining whether relief is

16   precluded by § 2254(d)). It is the habeas petitioner's burden to show [she] is not precluded from

17   obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

18          "Clearly established federal law, as determined by the Supreme Court of the United

19   States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

20   the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412

21   (2000); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law

22   determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d

23   1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law

24   to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has

25   repeatedly explained that AEDPA -- which embodies deep-seated principles of comity, finality,

26   and federalism -- establishes a highly deferential standard for reviewing state-court

27   determinations. *See id.* at 436. Thus, the Court has emphasized that "[a] federal court may not

28   overrule a state court for simply holding a view different from its own, when the precedent from

**United States District Court**

For the Northern District of California

22

1    [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per

2    curiam); *see also Rice v. Collins*, 126 S. Ct. 969 (U.S. 2006).

3            Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

4    States Supreme Court precedents "if it applies a rule that contradicts the governing law set forth in

5    [Supreme Court] cases,'or if it confronts a set of facts that are materially indistinguishable from a

6    decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537

7    U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application"

8    clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies

9    the correct governing legal principle from the Supreme Court's decisions, but unreasonably

10   applies that principle to the facts of the prisoner's case.  *Williams*, 529 U.S. at 413.

11           A federal habeas court "may not issue the writ simply because that court concludes in its

12   independent judgment that the relevant state-court decision applied clearly established federal law

13   erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 412.  The

14   objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U. S. at 75-76; *Clark*

15   *v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*,  540 U.S. 968 (2003).  After *Lockyer*,

16   "[t]he writ may not issue simply because, in our determination, a state court's application of

17   federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is

18   not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than

19   [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

20           In determining whether the state court's decision is contrary to, or involved an

21   unreasonable application of, clearly established federal law, a federal court looks to the decision

22   of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

23   *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569, 578-79

24   (9th Cir. 2002) (where state supreme court denied habeas petition without comment, looking to

25   last reasoned decision of a state court as the basis of the state court's judgment), *rev'd on other*

26   *grounds*, 537 U.S. 3 (2002).  Here, the California Court of Appeal rendered the last reasoned state

27   court decision.

28

**United States District Court**

For the Northern District of California

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *see also Rice,* 126 S. Ct. at 976.  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  Under this standard, if the federal court determines that the state court's harmless error analysis was objectively unreasonable, and thus an unreasonable application of clearly established federal law, the federal court then proceeds to the *Brecht* analysis.  *Id.* at 877.

## DISCUSSION

**Issues Presented**

### I. Insufficiency of the Evidence

In her first claim, Petitioner contends that the evidence presented at trial was constitutionally insufficient to sustain a conviction for the murders of Leona Carpenter, Benjamin Fink and Dorothy Miller.  Specifically, Petitioner claims that the evidence presented by the prosecution was insufficient to establish that the deaths were the result of a criminal agency.[29]

---

[29]  In her traverse, Petitioner argues that Respondent's answer relies on a number of cases addressing the 'corpus delicti' requirement, a lower threshold of proof, to support the proposition that the evidence was sufficient to convict.  California's corpus delicti rule is summarized in *People v. Armitage*, 194 Cal. App. 3d 405, 421-22 (1987): "corpus delicti rule prevents a petitioner from being convicted of a crime on the basis of his extrajudicial confessions or admissions alone.  It requires therefore that 'the corpus delicti of a crime must be proved independent of the accused's extrajudicial confessions.'  This means that independent of the accused's extrajudicial confessions or admissions the People must introduce evidence that a crime was committed by someone.  The corpus delicti consists of proof of an injury, loss or harm and that a criminal agency caused them

United States District Court

For the Northern District of California

*United States District Court*

For the Northern District of California

1   (*Id.*)  A careful review of the record establishes that Petitioner is not entitled to habeas relief on

2   this claim.

3       **A. Legal Standard**

4       The Due Process Clause "protects the accused against conviction except upon proof

5   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

6   charged."  *In re Winship*, 397 U.S. 358, 364 (1970); *cf. Fiore v. White*, 531 U.S. 225, 228-29

7   (2001) (due process violated where basic element of crime not proven because statute did not

8   prohibit defendant's conduct).  A state prisoner who alleges that the evidence in support of her

9   state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to

10  find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven,

11  entitles her to federal habeas relief.  *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

12      A federal court collaterally reviewing a state court conviction does not determine whether

13  it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982

14  F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993).  Rather, the federal court

15  "determines only whether, 'after viewing the evidence in the light most favorable to the

16  prosecution, any rational trier of fact could have found the essential elements of the crime beyond

17  a reasonable doubt.'"  *See id.* (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact

18  could have found proof of guilt beyond a reasonable doubt may the writ be granted.  *See Jackson*,

19  443 U.S. at 324; *Payne,* 982 F.2d at 338.

20      If confronted by a record that supports conflicting inferences, a federal habeas court

21  "must presume – even if it does not affirmatively appear on the record – that the trier of fact

22  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

23  *Jackson*, 443 U.S. at 326.  A jury's credibility determinations are therefore entitled to near-total

24  deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional

25

26  to exist.  It is not necessary to show that the petitioner was the actor.  And, proof of the corpus delicti need not
    be beyond a reasonable doubt; a 'slight or prima facie showing, permitting the reasonable inference that a crime
27  was committed, is sufficient.'"  *Id.*  Because the California Court of Appeal applied the proper standard of
    review set forth in *Jackson* and rejected Petitioner's claim that there was insufficient evidence to support the
28  conviction, the Court need not address whether Respondent can rely on corpus delicti requirement in support of
    Petitioner's conviction.  *See Early*, 537 U.S. 3.

United States District Court

For the Northern District of California

1   of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility

2   determinations.  *See Jackson*, 443 U.S. at 326; *see also People of the Territory of Guam v.*

3   *McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994).

4          The prosecution need not affirmatively rule out every hypothesis except that of guilt.

5   *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326); *see also Davis v.*

6   *Woodford*, 384 F.3d 628, 639-41 (9th Cir. 2004) (finding sufficient evidence of premeditation).

7   The existence of some small doubt based on an unsupported yet unrebutted hypothesis of

8   innocence therefore is not sufficient to invalidate an otherwise legitimate conviction.  *Taylor v.*

9   *Stainer*, 31 F.3d 907, 910 (9th Cir. 1994).  Circumstantial evidence and inferences drawn from

10  that evidence may be sufficient to sustain a conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358

11  (9th Cir. 1995).  After AEDPA, a federal habeas court applies the standards of *Jackson* with an

12  additional layer of deference.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (2004).  Generally, a federal

13  habeas court must ask whether the operative state court decision reflected an unreasonable

14  application of *Jackson* and *Winship* to the facts of the case.  *Id.* at 1275.

15      **B.  Analysis**

16         The issue here is whether, "viewing the evidence in the light most favorable to the

17  prosecution, any rational trier of fact" could have (1) convicted Petitioner of the murders of

18  Carpenter, Fink and Miller, and (2) found the multiple murder special circumstance true under

19  California Penal Code §§ 187, 190.2(a)(3).  *See Jackson*, 443 U.S. at 319.  For the crime of

20  murder, California case law allows knowledge to be inferred from surrounding circumstances.

21  (Pet. Ex. A at 35-36, citing *People v. Raley*, 2 Cal. App. 4th 870, 890-891 (1992).)  Relying on

22  state law, the California Court of Appeal rejected Petitioner's claim, concluding that the evidence

23  was sufficient to support the jury's verdict on the grounds that "a murder verdict can be upheld

24  even in the absence of evidence of the cause of death."  (Pet'r Ex. A at 45.)

25         In affirming Petitioner's conviction, the California Court of Appeal considered evidence

26  of the circumstances surrounding the three deaths and Petitioner's motive and false explanations

27  for the decedents' disappearances.  (Pet. Ex. A at 36-42.)  With respect to the circumstances

28

26

surrounding the deaths, the Court of Appeal noted that each of the three decedents died under

mysterious circumstances within two months of arriving at 1426 F Street:

> The three deaths occurred in secret and defendant ensured that the bodies were
> disposed of so as to keep the deaths a secret . . . [The decedents' bodies] were all
> found buried in defendant's yard with traces of flurazepam in their systems.
> Empty flurazepam capsules were found concealed in defendant's residence, and
> defendant had a large number of prescriptions for flurazepam.

(Pet'r Ex. A at 42.)

The Court of Appeal also found that "[W]hile all three individuals suffered from long

term health problems, there was substantial evidence that these problems did not pose any

immediate threat of death at the times of their deaths." (*Id.*)  Turning to the specific facts of

Petitioner's motive, the California Court of Appeal found that "before each death, defendant

obtained control over the decedent's financial assets, and, after each death, defendant continued to

obtain funds directed to the decedents." (*Id.* at 39.)  Petitioner then used the funds for her own

purposes.  As to the false explanations, the California Court of Appeal found that the record

reflected that Petitioner not only concealed the fact of Carpenter, Fink and Miller's deaths but she

also "concocted stories to explain their disappearances." (*Id.*)  Petitioner's false stories included:

(1) Carpenter had been taken away by her daughter or had gone to a nursing home; (2) Miller had

been taken away by a nurse after Petitioner evicted her or had gone to a hospital in Martinez for

alcoholism treatment; and (3) Fink had gone to Marysville after Petitioner evicted him. (*Id.* at

38.)  Eventually, the decedents' bodies, including four others, were found buried in Petitioner's

yard.  Even Petitioner conceded that although she was cooperative and "gave permission to dig in

her yard," she later fled her home to avoid arrest.  (Pet. at 49.)

The Court finds that the California Court of Appeal's decision affirming Petitioner's

convictions is supported by evidence sufficient to prove the elements of the crimes beyond a

reasonable doubt.  *See* 28 U.S.C. § 2254(d)(1); *In re Winship*, 397 U.S. at 365-68; *Jackson*, 443

U.S. at 319.  It does not matter that much of the evidence was circumstantial because it is well

established that "circumstantial evidence and inferences drawn from the evidence are sufficient to

sustain a conviction." *Maass*, 45 F.3d at 1358.  It is also well established that in a federal habeas

corpus proceeding, deference must be given to the state law interpretation of the substantive

United States District Court

For the Northern District of California

1   elements of a state offense.  *Jackson*, 443 U.S. at 324  ("The standard must be applied with

2   explicit reference to the substantive elements of the criminal offense as defined by state law.").

3           Petitioner does not dispute that the prosecution established a substantial number of

4   "incriminating facts."  (Traverse at 7.)  Rather, Petitioner's contention is that these facts only prove

5   that she "is a thief," not that "the demise of the decedents was a result of criminal agency."  (*Id.*)

6   Contrary to Petitioner's arguments, however, this is not a case where a thief "has been

7   unconstitutionally convicted and imprisoned as a [murderer]."  (Traverse at 7, citing *Jackson*, 443

8   U.S. 307.)  The problem with Petitioner's argument is that it fails to "view the evidence in the

9   light most favorable to the prosecution."  *See Jackson*, 443 U.S. at 319.  This factor requires the

10  Court to analyze whether "any rational trier of fact could have found the essential elements of the

11  crime beyond a reasonable doubt," not whether "it believes that the evidence at the trial

12  established guilt beyond a reasonable doubt."  *Id.* (quoting *Woodby v. INS*, 385 U.S. 276, 282

13  (1966)).

14          The jury could have reached the conclusion, and thus agree with Petitioner, that the

15  evidence failed to establish the precise means by which each of the decedents died.  However, the

16  circumstantial evidence and the inferences drawn from that evidence at trial permitted the jury to

17  reject Petitioner's assertion.  *See Maass*, 45 F.3d at 1358.  Furthermore, as the Court of Appeal

18  observed, the fact that the cause of death could not be definitively established or that no one saw

19  Petitioner committing the acts does not mean that the evidence is inconsistent with the verdict.

20  When the mass of incriminating evidence is considered together with the large number of

21  decedents residing in Petitioner's residence whose deaths occurred under similar, highly unusual

22  circumstances, the Court finds ample basis to support the state court's determination that any

23  rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See id.*

24          On February 10, 2006, Petitioner submitted a letter to the Court citing new authority in

25  support of her insufficiency of the evidence claim.  (*See* Letter dated Feb. 10, 2006, citing *Smith v.*

26  *Mitchell*, 2006 U.S. App. LEXIS 3121 (9th Cir. Cal. Feb. 9, 2006).)  The Court finds, however,

27  that the evidence and other circumstances surrounding the conviction in *Smith* renders the case

28  inapposite.  In *Smith*, the petitioner's infant grandson died during the night.  The attending

physician at the hospital suspected that he died of Sudden Infant Death Syndrome.  The

prosecution's theory instead relied on Shaken Infant Syndrome (SIS).  The jury convicted the

petitioner despite conflicting expert testimony, and the California Court of Appeal affirmed the

conviction.

The Ninth Circuit concluded that the California Court of Appeal's decision affirming the

petitioner's conviction was an unreasonable application of *Jackson* in light of "the troubling state

of the evidence" and "other circumstances" surrounding the case.  *Id.* at *14.  As to the evidence,

the prosecution's expert witnesses' hypothesis were that violent shaking had torn or sheared the

brain stem.  *Id.* at *18.  The court found, however, that the medical evidence was not typical, in

that some of the telltale signs usually found in shaken baby cases did not exist.  *Id.*  The court held

that "[a]n expert's testimony as to a theoretical conclusion or inference does not rescue a case that

suffers from an underlying insufficiency of evidence to convict beyond a reasonable doubt."  (Id.

citing *United States v. Boissoneault*, 926 F.2d 230, 234 (2d Cir. 1991).  Regarding the

circumstances surrounding the case, the court found that (1) the petitioner was helping her

daughter raise her other children (a 2-year-old and a 14-month-old), (2) there was no abuse or

neglect of these other children, who were in the same room with the baby when he died, (3) there

was no evidence of any precipitating event that might have caused the petitioner to snap and

assault her grandson, and (3) she was not trapped in a hopeless situation with a child she did not

want or love.  As such, the Ninth Circuit found that "[n]othing significant in [the petitioner's]

background suggests guilt, therefore, and many factors suggest innocence." *Id.* at *15.

Contrary to *Smith*, Petitioner's conviction was based on "the stuff from which guilt

beyond a reasonable doubt can be established, especially in the face of all the other

circumstances" established in this case.  *Id.*  As the California Court of Appeal noted, Petitioner's

"extremely selective version of the facts fails to take into account many of the incriminating facts

which provide substantial support for the jury's verdict."  (Pet'r Ex. A at 37.)  The decedents were

living in Petitioner's residence at the time of their deaths.  "The bodies did not just happen to be

buried in defendant's yard."  (*Id.*)  The facts and circumstances surrounding the case "strongly

support a finding" that Petitioner was responsible for the burial of these bodies.  (*Id.*)

**United States District Court**

For the Northern District of California

29

1    Accordingly, the California Court of Appeal's rejection of Petitioner's sufficiency of the evidence

2    claim based on the standard set forth in *Jackson* was not unreasonable. *See Jackson,* 43 U.S. at

3    319. Nor was the rejection of Petitioner's insufficiency of the evidence claim contrary to, or an

4    unreasonable application of, clearly established federal law, or an unreasonable determination of

5    the facts in light of the evidence presented at trial. *See* 28 U.S.C. § 2254(d)(1)-(2). Therefore,

6    Petitioner is not entitled to federal habeas relief on this claim.

7        **II. Due Process Right to Notice**

8        In her second claim, Petitioner asserts inadequate notice in the information of the legal

9    theories and factual allegations on which she was convicted. Specifically, Petitioner contends that

10   because the prosecutor explicitly stated that he would not be able to prove that the decedents were

11   "poisoned to death," she was misled and later ambushed when the prosecutor pursued the first-

12   degree murder by poison theory and the second-degree felony murder theory. (Traverse at 8.) A

13   careful review of the record shows that Petitioner is not entitled to habeas relief on this claim.

14       **A. Legal Standard**

15       The Sixth Amendment, incorporated within the Due Process Clause of the Fourteenth

16   Amendment, guarantees a criminal defendant the fundamental right to be clearly informed of the

17   nature and course of the charges against her in order to permit adequate preparation of a defense.

18   *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir. 1995); *Sheppard v. Rees*, 909 F.2d 1234, 1236

19   (9th Cir. 1990). To determine whether a defendant has received fair notice of the charges against

20   her, the court looks first to the information. *James v. Borg*, 24 F.3d 20, 24 (9th Cir.), *cert. denied*,

21   513 U.S. 935 (1994). The principal purpose of the information is to provide the defendant with a

22   description of the charges against her in sufficient detail to enable her to prepare a defense. *See*

23   *id.*; *United States v. Lane*, 765 F.2d 1376, 1380 (9th Cir. 1985). An information is not

24   constitutionally defective if it states "the elements of an offense charged with sufficient clarity to

25   appraise a defendant of what to defend against," *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.

26   1985) (quoting *Russell v. United States*, 369 U.S. 749, 763-64 (1962)), even if it does not state the

27   method by which the crime was committed. *Calderon*, 59 F.3d at 1009.

28

**United States District Court**

For the Northern District of California

30

United States District Court

For the Northern District of California

The right to notice of the charge does not include a constitutional right to notice of the evidence the state plans to use to prove the charge. *Gray v. Netherland*, 518 U.S. 152, 168-69 (1996). But the prosecution may not mislead the defense about the evidence it intends to use at trial. *See id.* at 164-65 (allegation that prosecution misled defense about evidence it intended to use at trial may state a claim for violation of due process). However, it has also been recognized that adequate notice of the nature and cause of the accusation may be provided to a defendant by means other than the charging document. *See Calderon*, 59 F.3d at 1010 (defendant received adequate notice of the nature of the charge and the prosecution's theory through the prosecutor's opening statement, the evidence introduced at trial and by the trial court's description of the crime scene in ruling on his motion for acquittal at the close of the prosecution's case); *Stephens v. Borg*, 59 F.3d 932, 936 (9th Cir. 1995) (defendant found to have received adequate notice of the prosecution's intent to rely on a felony-murder theory where the prosecution requested such an instruction while the defense case was being presented); *Morrison v. Estelle*, 981 F.2d 425, 428-29 (9th Cir. 1992) (defendant received adequate notice of the prosecution's felony-murder theory through testimony adduced at trial during course of trial and when the prosecution requested a felony-murder instruction two days before closing arguments); *Nevius v. Sumner*, 852 F.2d 463, 471 (9th Cir. 1988), *cert. denied*, 490 U.S. 1059 (1989) (adequate notice provided because the indictment referred to the state statutes defining the crime).

**B. Analysis**

Here, the California Court of Appeal found that, pursuant to state law, Petitioner received adequate notice of the charges to first-degree murder and felony murder from the evidence alleged in the information. Regarding the first-degree murder charge, the Court of Appeal reasoned that first-degree murder by poison is a theory of first-degree murder which requires malice but does not require premeditation. (Pet'r Ex. A at 50, citing Cal. Pen. Code §§ 187, 189.) The Court of Appeal found that the evidence presented at the preliminary hearing and trial was sufficient to put Petitioner on notice of the prosecutor's theories.[30] Specifically, the court found: (1) proof was

---

[30] The Second Supplemental Clerk's Transcript on Appeal contain the Reporter's Transcript of the preliminary hearing lodged in response to this Court's order to show cause.

**United States District Court**

For the Northern District of California

1    presented that pills, pill remnants, and gelatin capsules with contents missing had been discovered

2    at the entrance of Petitioner's bedroom; (2) the prosecutor adduced evidence that flurazepam is

3    highly soluble in both water and ethyl alcohol; (3) evidence reflected that the presence of

4    flurazepam in the bodies indicated that it had been ingested within a twenty-four hour period

5    preceding death; (4) evidence indicated that ingestion of therapeutic levels of two drugs could

6    produce a toxic effect; (5) a witness testified that Petitioner had spoken of drugging people and

7    taking their money and that Petitioner was breaking open pink tranquilizers and pouring their

8    contents into a drink; and (6) this witness had also accused Petitioner of drugging her.  (*Id.*; *see*

9    *also* Resp Ex. C, 1-8.)

10        Regarding the prosecutor's second-degree murder theory, the California Court of Appeal

11    found this "[A] more difficult question."  (Pet'r Ex. A at 51.)  The Court of Appeal noted that the

12    underlying felony described in the trial court's jury instruction was a violation of California Penal

13    Code § 347 (a) because the prosecutor had not requested the second-degree felony murder

14    instructions until after the close of evidence.  Section 347 states, "[E]very person who willfully

15    mingles any poison or harmful substance with any food, drink, medicine, or pharmaceutical

16    product . . . where the person knows or should have known that the same would be taken by any

17    human being to his or her injury, is guilty of a felony."  (*Id.*, citing Cal. Pen. Code § 347 (a).)

18    Despite the error, the court concluded that Petitioner received adequate notice because the

19    prosecutor introduced the underlying theory during the preliminary hearing, during pre-trial

20    proceedings, in his opening statement and repeatedly during trial.  (Pet Ex. A at 50-52, citing

21    *People v. Johnson* 233 Cal. App.3d 425 (1991).)

22        Petitioner nonetheless contends that she was "misled" and later "ambushed" at trial by not

23    knowing until the instructional conference following the close of evidence against which theory

24    she was defending.  (Pet at 59.)  To support her claim, Petitioner points to the charge in the

25    information: "'willfully, unlawfully, and feloniously and with malice aforethought murdered 'nine

26    people.'"  (Pet. at 57.)  While she conceded that the murder charge, standing alone, was sufficient

27    to give her notice that she could be tried based on many of the "conventional" theories of murder

28    liability, she asserts that she was misled when during pre-trial motions the prosecutor stated:

32

The people's theory ultimately is going to shake down to first degree premeditated murder . . . I would like to prove in my heart of heart [sic] that these people were poisoned to death, but the state of the evidence is not so. There is a good body of evidence that indicates that it's death by poisoning, but I won't be able to do that, and I have made it clear in moving papers [sic].

(*Id.*; Reporter's Transcript on Appeal (RT) at 5789.)

The prosecution went on to outline a theory of death by asphyxiation stating that "the People's theory of first degree is the use of Dalmane to incapacitate the people and the people died of some form of asphyxial death . . . . So Dalmane is going to be used to show the presence of criminal agency and to identify the perpetrator."  (Resp. Ex. E 5790.)

The California Court of Appeal addressed the prosecutor's statements as follows:

[W]e do not attach the same meaning to the prosecutor's pre trial statement as defendant.  [T]he prosecutor's candid prediction that he would not be able to prevail at trial on a theory that the decedents had been poisoned to death was precisely what it appeared to be: a frank assessment of the weakness of the theory.  No reasonable defense counsel would have been misled by this statement into believing that the prosecutor was thereby abandoning a theory which had been presented at the preliminary hearing and addressed by instruction submitted by the prosecutor.  The fact that the prosecution mentioned the evidence he believed supported this theory during his opening statement confirmed that he had not abandoned this theory.

(Pet'r Ex. A at 50-52.)

Petitioner urges the Court to find the decision contrary to, or an unreasonable application of federal law because "[i]n the absence of any affirmative misleading statements by the prosecutor, [Petitioner's] defense could have been held responsible for being on notice for all theories for which notice was arguably given through the prosecutor's presentation at trial." (Traverse at 11.)

Petitioner relies principally on two cases to support her argument: (1) *Givens v. Housewright*, 786 F.2d 1378 (9th Cir. 1986), and (2) *Sheppard v. Rees*, 909 F.2d 1234 (9th Cir. 1989).  In *Givens*, the defendant was charged with first-degree murder under a Nevada statutory scheme similar to California's.  Next to its caption, the information cited two criminal statutes which defined murder and its two degrees.  The evidence at trial indicated that Givens had beaten the victim with his fists and a crutch.  At the close of the evidence, the trial court instructed the jury on both premeditated murder and murder by torture.  The Ninth Circuit concluded that the information was "constitutionally inadequate," holding that the mere citation to a statute which

33

defined the degrees of murder did not provide proper notice to enable the defendant to prepare a defense to the charge of murder by torture. Because the elements of premeditated murder were distinct from the elements of murder by torture, defendant was not able to present an adequate defense without knowing in advance under which theory the state sought conviction. The Ninth Circuit found that this error was not harmless beyond a reasonable doubt. *Givens*, 786 F.2d at 1381.

In *Sheppard*, the defendant was charged with one count of murder under California Penal Code § 187 and the case was tried on the theory that the killing was premeditated to collect an alleged debt that Sheppard felt the victim owed her. After both sides rested and submitted their requested jury instructions, the prosecution sought a felony murder instruction based on the felony of robbery. This was the first time that the prosecution had raised the issue of felony murder. Defense counsel objected that there was no substantial evidence to support a felony murder theory and that the state had not charged defendant with robbery. The trial judge nevertheless gave the instruction and the prosecution argued for a felony murder conviction during closing argument. The jury convicted Sheppard of first-degree murder, without indicating whether it was on the theory of premeditated or felony murder. *Sheppard*, 909 F.2d at 1236-37.

On rehearing, the state conceded that the defendant was denied adequate notice of the felony murder theory and an opportunity to defend where the first mention of reliance on felony murder was made just before jury arguments, the morning after the instructions had been settled without inclusion of felony murder or the predicate felony of robbery, and where the concept of felony murder had not arisen, directly or indirectly, in the taking of testimony. *Id.* Therefore, the only question that the *Sheppard* court decided was whether a harmless error analysis was appropriate and concluded that it was not. *Id.* The *Sheppard* case stands for the proposition that a Sixth Amendment notice violation is not subject to harmless error analysis. *Id.* at 1238 n.3.

Petitioner argues that *Givens* and *Sheppard* control the analysis here because both cases stand for the proposition that the petitioner had been affirmatively misled. (Traverse at 10.) The Court disagrees because *Givens* and *Sheppard* are readily distinguishable from the present case. In *Givens*, although the Court held that mere citation to a statue was constitutionally inadequate to

provide proper notice of the charges against the defendant, the court also found that an indictment may well be constitutionally adequate even though it does not catalog every element of the offense. *See Givens*, 786 F.2d 1378.  Moreover, contrary to facts in this case, *Sheppard* involved "a pattern of government conduct [that] affirmatively misled the defendant, denying [her] an effective opportunity to prepare a defense." *Id.* at1236-37.  This supported the Ninth Circuit's conclusion that, "[t]he defendant was ambushed" and the right to notice violated.  *Id.* (*quoting Gray*, 662 F.2d at 575).  These narrow rulings are factually distinguishable and do not provide support for Petitioner's argument.

During the preliminary hearing, the prosecution presented evidence to support its poisoning theory.  (Resp. Ex. E, *Motion re Excluding Evidence of Dalmane*, RT 5782-96.)  On October 13, 1992, well in advance of trial, the prosecution filed its list of jury instructions, which included the murder by poison theory.  On October 14, 1992, the state superior court heard arguments on the defense's motion to exclude evidence of the use of Dalmane.  In response to questions from the state superior court judge, the prosecutor stated, "we probably have evidence to show that Dorothea Puente was able to control her victims . . . [S]o Dalmane is going to be used to show the presence of criminal agency and identify the perpetrator."  (RT at 5789-90.)  Based on the foregoing, the Court finds that the facts in this case are unlike *Sheppard*'s because the theories of murder were raised, either directly or indirectly, in the motion to exclude evidence, and later during pretrial proceedings, opening statements, and the taking of testimony.  *Sheppard*, 909 F.2d at 1235.

Moreover, this is not a case where the Petitioner was unaware that she was being called upon to defend a felony-murder charge.  Defense counsel had every reason to be thinking about poison by death.  Unlike *Sheppard*, the prosecution here did not request and receive instructions on felony-murder the morning of instructions.  *See Sheppard*, 909 F.2d at 1235-36.  Petitioner had time to tailor her arguments to defend against the charge.  *Cf. id.* at 1236-37.  Defense counsel had thirteen days before closing arguments to move for a continuance or prepare his closing arguments

United States District Court

For the Northern District of California

1   to counter the prosecution's theory or to prepare a defense without being prejudiced or surprised at

2   trial. *See Morrison*, 981 F.2d at 428; *also* Resp. Ex. E at 21058, 21073.[31]

3          Even if the Court were to conclude, as in *Givens* and the state's concession in *Sheppard*,

4   that the charging information against Petitioner did not itself provide her with adequate notice of a

5   felony murder theory, the Court still would find no error. The testimony presented at the

6   preliminary examination and throughout the trial court proceedings put the defense on adequate

7   notice that the prosecution intended to demonstrate that Petitioner was responsible for the three

8   deaths under a theory of first-degree murder. *See Calderon*, 59 F.3d at 1009; *Morrison*, 981 F.2d

9   at 428-29.

10         Accordingly, the state courts' denial of this claim was neither contrary to, or an

11   unreasonable application of, clearly established federal law, or based on an unreasonable

12   determination of the facts in light of the evidence presented in the state court proceedings. *See* 28

13   U.S.C. § 2254(d)(1, 2); *see also Rice*, 126 S. Ct. At 976 (even if "reasonable minds reviewing the

14   record might disagree about the prosecutor's credibility," it is inappropriate on habeas review "to

15   supersede the trial court's credibility determination"). Therefore, Petitioner is not entitled to

16   federal habeas relief on this claim.

17   **III.  Improper Jury Instruction**

18         Petitioner makes two assertions to support her claim that her federal constitutional rights

19   were violated by instructional error. Petitioner alleges: (1) the trial court's instruction imposing,

20   as a matter of law, a duty on Petitioner of providing medical care was erroneous; and (2) this

21   instruction improperly removed from the jury proof of a factual element that was necessary to

22   constitute the crime for which she was charged. (Pet. at 69.) A careful review of the record

23   shows that this claim does not merit habeas relief.

24   **A.  Legal Standard**

25         The Due Process Clause of the Fourteenth Amendment protects the accused against

26   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

27

28
_____

    [31]  In California, a defendant's "failure to request a continuance generally 'precludes any showing of prejudice attributable to [the] delay' in receiving notice of it." *People v. Williams* 16 Cal. 4th 153 (1997).

crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970). This constitutional principle prohibits the state from using evidentiary presumptions in a jury charge that have the effect of relieving the state of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Yates v. Evatt*, 500 U.S. 391, 400-03 (1991); *Carella v. California*, 491 U.S. 263, 265-66 (1989). Failure properly to instruct the jury on the necessity of proof beyond a reasonable doubt "can never be harmless error." *Gibson v. Ortiz*, 387 F.3d 812, 825 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 320 n.14).

**B. Analysis**

Here, the trial court instructed the jury that:

> Under [California] law, when one voluntarily undertakes the care of another, who is unable to adequately care for himself or herself, a special legal relationship arises which imposes an affirmative duty on one undertaking the care of the other to exercise reasonable care to provide for the health, welfare and safety of that person. This affirmative duty includes the obligation to obtain prompt and reasonable medical care and treatment for the other person where a reasonable person under the same or similar circumstances would do so, as well as an obligation not to do anything which would unreasonably endanger the health, welfare or safety of the other person.
>
> Where such a special relationship and affirmative duty exists, the doing of an act which there is a duty not to do so, or the failure to do an act which there is a duty to do may give rise to criminal liability under the instructions given to you with respect to the crimes of murder and involuntary manslaughter. Whether any such instructions apply will be determined by what you find to be the facts.

(Pet. at 72; RT at 21201-02.)

The California Court of Appeal rejected Petitioner's claim based on long established state law allowing "criminal liability [to] arise from a breach of a legal duty of care which results in death." (Pet'r Ex. A at 67, citing *People v. Montecino* 66 Cal. App. 2d 85 (1944).) Therefore, "[t]he omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." (*Id.*, citing *People v. Burden*, 72 Cal.3d 603, 616 (1977).) The court went on to hold that the challenged instruction merely set forth a

United States District Court

For the Northern District of California

1    tenet of California law, namely, that the instruction on the duty of care, which included the duty to

2    obtain medical care, is not impermissible.  (*Id.*)[32]

3             Having concluded that the state trial court's instruction was not erroneous, the California

4    Court of Appeal addressed Petitioner's assertion that the court's instruction improperly removed an

5    issue of fact from the jury.  The California Court of Appeal explained that Petitioner "fails to

6    grasp that duty is a question of law, not a question of fact, and therefore is necessarily decided by

7    the [state] court."  (Pet'r Ex. A at 70.)  Petitioner nonetheless contends that this is an incorrect

8    assessment of California law on the civil negligence concept of a duty of care in criminal cases.

9    (*Id.*; Traverse at 20.)  This Court, however, cannot question such an assessment because a

10   determination of state law by a state appellate court is binding in a federal habeas action.  *Hicks v.*

11   *Feiock*, 485 U.S. 624, 629 (1988).  A federal court may, however, re-examine a state court's

12   interpretation of its law if that interpretation appears to be an obvious subterfuge to evade

13   consideration of a federal issue.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975).  Because

14   there is no argument or evidence of subterfuge, the Court will look at the challenged jury

15   instruction only to determine whether the jury applied the instruction in a way that violates

16   Petitioner's due process rights.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

17            Petitioner argues that the trial court's instruction had a "substantial and injurious [effect]

18   because the jury would not have found on the evidence before it that Petitioner had contracted to

19   provide reasonable medical care or by her actions created or increased a risk that the deceased

20   would not receive medical care, had the instruction not been given."  (Pet. at 80.)  Petitioner relies

21   heavily on *United States v. Gaudin*, 515 U.S. 506 (1995), to establish such a violation.  However,

22   *Gaudin* is distinguishable from the immediate case.

23            In *Gaudin*, the defendant was convicted of making false statements on a federal bank

24   application in violation of 18 U.S.C. § 1001.  The statute required the accused not only make false

25   statements, but that the false statements be "material."  *Gaudin*, 515 U.S. at 509.  The trial court in

26   *Gaudin* instructed the jury that the statements the defendant was alleged to have made were

27

28            [32] The California Court of Appeal cited *People v. Oliver*, 210 Cal. App. 3d 138 (1989), which states
     that the rules governing the imposition of a duty to render aid or assistance as an element of civil negligence are
     applicable to the imposition of a duty in the context of criminal negligence.

**United States District Court**

For the Northern District of California

1  material as a matter of law; the jury had only to determine whether the defendant made the

2  charged statements.  The Supreme Court found that the instruction had "a natural tendency to

3  influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was

4  addressed." *Id.* at 512-513.  The Supreme Court reversed the guilty verdict holding that not only

5  did the jury have to determine the underlying factual acts, but the jury also was responsible for

6  applying the legal standard of 'materiality' based on the trial court's instructions.  *Id.*

7          Considered in light of "well established [federal law] that the instruction 'may not be

8  judged in artificial isolation,' but must be considered in the context of the instructions as a whole

9  and the trial record," the Court finds that no error occurred in the present case.  *See McGuir*e, 502

10 U.S. at 72.  The trial court did not withhold a material element capable of influencing the

11 decisionmaking of the jury.  *See Sandstrom*, 442 U.S. at 520-21.  The trial court's instruction was

12 accompanied by the caveat: "[W]hether any such instructions apply will be determined by what

13 you find to be the facts." (Pet Ex. A at 65.)  The trial court expressly instructed the jury that the

14 "the People have the burden of proving [Petitioner] guilty beyond a reasonable doubt." (RT

15 21193.)  The trial court then defined reasonable doubt and the crimes of murder in the first-

16 degree, murder in the second-degree and voluntary manslaughter.  (RT 21193-213.)  In addition,

17 the challenged instruction was based on defense counsel's acknowledgment that under the facts of

18 the case, the jury might find that the defendant entered into a "verbal contract" to take care of the

19 decedents.  (Pet. at 71; RT 21063-64.)

20         The deprivation of the right to trial by jury need not be invoked here because the jury was

21 not instructed to presume certain aspects of the case.  *See Jones*, 526 U.S. at 245-46; *see Apprendi

22 v. New Jersey*, 530 U.S. 466, 477-79 (2000), *Blakely v. Washington*, 52 U.S. 296, 301 (2004).  An

23 instruction that creates a mandatory presumption violates due process if it "directly foreclose[s]

24 independent jury consideration of whether the facts proved establish[] certain elements of [the

25 charged offense] . . . and relieve[s] the state of its burden of . . . proving by evidence every

26 essential element of [the] crime beyond a reasonable doubt." *Carella*, 491 U.S. at 265-66.  Here,

27 there is no reasonable likelihood that the jury disregarded the evidence in the case and applied the

28 instruction in a way that violated the Constitution.

United States District Court

For the Northern District of California

1    Accordingly, the California Court of Appeal's rejection of this claim was not contrary to,

2    or an unreasonable application of, clearly established law or based on an unreasonable

3    determination of the facts in light of the evidence presented in the state courts' proceedings.  28

4    U.S.C. § 2254(d)(1-2).  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

5        **IV.  Confrontation Clause**

6        In her fourth claim, Petitioner contends that her Sixth Amendment right to confrontation

7    was violated because the trial court precluded her from cross-examining toxicologist James Beede

8    (hereinafter toxicologist), a witness for the prosecution, about (1) alleged stolen drugs, (2)

9    whether he was a drug and/or alcohol abuser, and (3) whether the prosecutor considered him unfit

10   to function as a coroner's toxicologist.[33]  (Pet. at 83.)  Petitioner argues that inclusion of this

11   evidence would have allowed her to impeach the toxicologist's credibility sufficiently that it

12   would not have been credited by the jury.  Petitioner further asserts that the evidence would have

13   produced an alternative explanation for the presence of drugs in the seven decedents buried in her

14   back yard.  (Pet. at 90.)  A careful review of the record shows that Petitioner is not entitled to

15   relief based on this claim.

16       **A.  Legal Standard**

17       The Confrontation Clause of the Sixth Amendment provides that "in all criminal

18   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

19   [her] . . . ."  U.S. Const. amend. VI.  This right, which is incorporated by the Fourteenth

20   Amendment to apply to state prosecutions, *Pointer v. Texas*, 380 U.S. 400, 403 (1965),

21   "guarantees the defendant [not only] a face-to-face meeting with witnesses appearing before the

22   trier of fact," *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988), but also the right to cross-examine those

23

24       [33]  Regarding this latter claim, Petitioner asserts in a footnote that evidence from the toxicologist's
         personnel file indicated that he was a prime suspect in the theft of cocaine from the crime lab.  (Pet. at 95, n.
25       20.)  This contention was raised in Petitioner's brief to the California Court of Appeal as evidence that the
         District Attorney's office had recommended that the toxicologist's employment be terminated.  Because the
26       toxicologist was neither prosecuted nor terminated from his employment, Petitioner argued that this suggested
         that the prosecution had promised the toxicologist leniency in exchange for favorable testimony in the case.
27       Petitioner also used the argument to bolster her assertion that someone other than Petitioner could be
         responsible for the presence of Dalmane in the decedents buried in her yard.  The California Court of Appeal
28       noted that the argument was never made during the trial court proceeding, nor was there any evidence offered in
         support of the contention.  (Pet. Ex. A at 94.)

witnesses. *Pointer*, 380 U.S. at 404, 406-07; *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). The Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Even where cross-examination bears on the reliability or credibility of a witness sufficiently such that a jury might reasonably question such reliability or credibility, the cross-examination must nevertheless be "appropriate." *Id.*; *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974).

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted), *cert. denied*, 530 U.S. 1266 (2000).

## B. Analysis

At trial, Petitioner sought to impeach the toxicologist's credibility with evidence regarding (1) the toxicologist's alleged "theft of cocaine, diazepam or Ssufentanil from the lab; (2) an alleged substance abuse problem; and (3) the toxicologist's suspension, or the fact the he had been found in public under the influence of alcohol and Valium (diazepam), a controlled substance for which he had no prescription." (Pet. at 88.) At an *in camera* hearing, Petitioner argued that the toxicologist's preparation of the tissue samples from the bodies in which flurazepam and its metabolites were discovered should be found unreliable. (Pet. at 86-89, citing RT 10386-90; 9391-10413; Resp. Ex. F.) After weighing all the evidence, the trial court denied Petitioner's motion to include the proffered cross-examination. The trial court concluded that the

United States District Court

For the Northern District of California

relevance of the proffered impeachment evidence was minimal because the toxicologist's credibility was a "collateral issue" and the defense had failed to present evidence from which it could be inferred that the tissue samples from the seven decedents had not all been contaminated with flurazepam.  (Pet. Ex. A 90-93.)  The trial court also found that admission of the evidence, pursuant to California Evidence Code § 352, would consume "a real huge amount of time," would "confuse things," and the "slight probative value is substantially outweighed by the prejudicial effect."  (*Id.*)  The trial court nonetheless allowed Petitioner to assert that the toxicologist (1) contaminated tissue samples with cocaine, (2) mislabeled samples, (3) failed to follow standard lab procedures, (4) was disciplined by the Coroner's Office for failing to comply with proper procedure for safe handing of drugs and narcotics, and (5) had at his work area drugs including heroine, cocaine, fenatanyl, and Ssfentanil for the purpose of doing tests for personal reasons not authorized by the Coroner's Office.  (Pet. at 88)

Petitioner appealed the decision to the California Court of Appeal arguing that the trial court erred by excluding the proffered impeachment evidence.  The California Court of Appeal rejected Petitioner's claim on the merits, concluding that the trial court properly excluded the proffered cross-examination of the toxicologist pursuant to Evidence Code § 352.  (Pet'r Ex. A at 93.)  The Court of Appeal assessed whether the proffered evidence had any probative value with respect to Petitioner's contention that it would help to show (1) that the toxicologist mishandled the homogenates and (2) that he was an unreliable witness.  (Pet'r Ex. A at 91.)  The court opined: [w]hile the absence of a link between the proffered substance abuse evidence and the [toxicologist's] handling of the homogenates in this case did not make the excluded evidence completely irrelevant, it did make the probative value of this evidence fairly minimal."  (*Id.*)  As to the toxicologist's credibility, the Court of Appeal held: "[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.  Beyond this, the latitude California Evidence Code § 352 allows for exclusion of impeachment evidence in individual cases is broad.  The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues."  (*Id.* at 92, citing *People v. Wheeler*, 4 Cal.4th 284, 296, (1992).)  The court explained that

42

**United States District Court**

For the Northern District of California

1   although theft is clearly a crime involving moral turpitude, the speculative nature of the evidence

2   gave it little probative value. (*Id.*)  In weighing the probative value of the proffered evidence

3   against the danger of undue consumption of time and confusion of the issues, the California Court

4   of Appeal concluded that allegations of theft and substance abuse were disputed factual issues

5   which had little impact on credibility and were, at best, speculative. (*Id.* at 94.)

6       This Court finds that the application of California Evidence Code § 352 to exclude the

7   proffered evidence did not result in a Confrontation Clause violation. *See Van Arsdall*, 475 U.S.

8   at 679; *Davis*, 415 U.S. at 318.  Petitioner relies on a number of federal cases in which the failure

9   to allow cross-examination violated the Confrontation Clause by depriving the jury of facts

10  necessary for its credibility determination.  However, examination of the three *Beardslee* factors,

11  *i.e.*, whether "(1) the evidence was relevant; (2) there were other legitimate interests outweighing

12  the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury

13  with sufficient information to assess the credibility of the witness," to evaluate Petitioner's

14  assertion leads to the conclusion that no violation occurred. *Beardslee*, 197 F.3d at 383.

15      The Court first considers whether Petitioner's proffered cross examination evidence was

16  relevant to her claim.  Petitioner's defense during trial was that she might be responsible for

17  burying bodies in her yard, but she could not be found guilty of killing the victims because there

18  was no evidence that the alleged victims had died as a result of a "criminal agency." (Pet. at 6.)

19  Petitioner asserts that evidence of the toxicologist's drug/and or alcohol abuse is directly relevant

20  to the validity of the physical evidence produced at trial, and, if allowed, would have presented a

21  different impression of the toxicologist's credibility.  The record demonstrates, however, that the

22  trial court heard defense counsel's arguments and believed that the proffered evidence had no

23  bearing on the case because evidence that the toxicologist was a substance abuser had little

24  probative value. *See Walters v. McCormick*, 122 F.3d 1172, 1177 (9th Cir. 1997) (evidence not

25  relevant where defendant fails to explain how history of abuse, or of false accusations of abuse,

26  would give mother reason to testify falsely and influence her daughter in false accusation of

27  molestation).

28

43

**United States District Court**

For the Northern District of California

1   As to the second *Beardslee* factor, the potential for juror confusion was a legitimate

2   interest supporting the exclusion of the proffered evidence.  The potential for undue consumption

3   of time diverted to collateral issues of the toxicologist's alleged drug abuse and public intoxication

4   was very high because the issues would not have had a substantial effect or influence on the

5   outcome of trial in light of all the evidence in the record.  *See Van Arsdall*, 475 U.S. at 679.

6   Moreover, the evidence on record of the toxicologist's credibility suggests that further

7   cross-examination likely would have been repetitive.

8   Petitioner suggests that the third *Beardslee* factor, *i.e.*, whether the exclusion of the

9   proffered evidence left the jury with sufficient information to assess the credibility of the witness,

10   is critical to her case.  Petitioner argues that had the defense been allowed to cross-examine fully

11   the toxicologist on the excluded evidence, it would have been able to present an "alternative

12   innocent explanation for the presence of flurazepam in the seven decedents buried in [Petitioner's]

13   back yard."  (Pet. at 94.)  The record indicates, however, that the trial court's decision under

14   California Evidence Code § 352 to exclude the impeachment evidence did not deprive Petitioner

15   of the opportunity for effective cross-examination.  Again, effective cross-examination should not

16   be construed as effective in whatever way, and to whatever extent, the defense might wish.  *See*

17   *Fensterer*, 474 U.S. at 20.  The record reflects other effective impeachment evidence was

18   available to the defense.  For example, the trial court did not prohibit an inquiry into the

19   toxicologist's credibility.  Furthermore, the defense used the evidence to cross-examine the

20   toxicologist regarding his preparation of the tissue samples and failure to follow proper procedure.

21   Even if the Court assumes that the exclusion of the impeachment evidence violated

22   Petitioner's right of confrontation, Petitioner would still not be entitled to relief as to this claim.

23   *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637.).

24   Assuming that the trial court did err in restricting the cross-examination, whether the restriction

25   resulted in a violation of Petitioner's Confrontation Clause rights is judged under the trial error

26   standard.  In assessing the denial of cross-examination on a proper subject, this Court assumes

27   that the prohibited cross-examination would have damaged the prosecution's case and then

28   determines, in light of the importance of (1) the witness' testimony in the entire case, (2) the

44

**United States District Court**

For the Northern District of California

1   extent of the cross-examination otherwise permitted, and (3) the overall strength of the

2   prosecution's case, whether the error had a substantial and injurious effect or influence in

3   determining the jury's verdict.  *See United States v. Miguel*, 111 F.3d 666, 671-72 (9th Cir. 1997)

4   (citing *Van Arsdall*, 475 U.S. at 684); *see Brecht*, 507 U.S. at 637.

5          A review of the state court's record shows that any error could not have had a prejudicial

6   effect or influence in determining the jury's verdict when assessed in context of the other evidence

7   presented at trial. As the state appellate court explained, Petitioner "did not offer any evidence that

8   [the toxicologist] was under the influence during his discharge of his duties, let alone during the

9   period of time that he was dealing with the evidence in this case." (Pet. at 92.)  In addition,

10  "[e]vidence that [the toxicologist] was a substance abuser or had stolen drugs from the lab simply

11  had little tendency to show that he had in fact confused or contaminated one homogenate with

12  another." (*Id.*)  The Court must defer to the state court's factual finding that the evidence

13  suggesting that the toxicologist tainted the blood of all the decedents was not reliable because it

14  was too speculative in nature.  28 U.S.C. § 2254(e)(1); *See Rice*, 126 S. Ct. at t 975 ("it is

15  inappropriate on habeas review to supersede the trial court's credibility determination"); *Sumner*,

16  449 U.S. at 546-47.

17         The California Court of Appeal's determination, therefore, that the exclusion of the

18  evidence did not violate the Confrontation Clause was not contrary to, or an unreasonable

19  application of clearly established federal law as set forth by the Supreme Court precedent existing

20  at the time of the state court's decision.  28 U.S.C. § 2254(d)(1).  Nor was the state court's

21  adjudication of the claim "based on an unreasonable determination of the facts in light of the

22  evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2)*; see Van Arsdall*, 475

23  U.S. at 679.  Accordingly, this claim does not merit habeas relief.

24         **V. Petitioner's Request for an Evidentiary Hearing**

25         Petitioner's fifth and final claim challenges the scope of the state superior court's

26  evidentiary hearing on her juror misconduct claims.  Petitioner argues that the California Court of

27  Appeal's decision affirming the factual findings of the state superior court was an unreasonable

28  determination of the facts because she was denied a full evidentiary hearing.  Specifically,

United States District Court

For the Northern District of California

Petitioner asserts that the state superior court denied her an opportunity to develop the factual basis of her claims, despite her diligent efforts to search for evidence. Petitioner's juror misconduct claims fall into two broad categories: (1) the original juror misconduct claims, which were the subject of the evidentiary hearing in the state superior court, and (2) the "new claims" or those juror misconduct claims that came to light in the papers filed in the evidentiary hearing and during the course of the hearing itself. (Pet. at 111-158.) As to the first category of claims, Petitioner argues that the jurors engaged in a host of prejudicial misconduct, thereby depriving her of the right to a fair trial. (Pet. at 115-18.) Petitioner also takes issue with the state evidentiary hearing being conducted without rights to discovery and/or compulsory process of: (1) the notes pertaining to the eleven jurors who had refused to talk to Petitioner; and (2) juror Bingham's declaration. Petitioner further asserts that the state court curtailed her counsel's attempts to ask additional questions of the jurors who testified in the evidentiary hearing to support the credibility of juror Sanchez and demonstrate the biases of the other jurors, and additional questions regarding juror Hewlett-Raticliff's study of obituaries.

Regarding the second category of claims, which were not alleged in the original state court habeas petitions and were dismissed by the California Court of Appeal on procedural bar grounds, Petitioner alleges that: (1) the jurors improperly conducted research using "a paperback book" admitted at trial for the purpose of demonstrating Petitioner's knowledge of drugs (Pet'r Ex. H, *150 Commonly Prescribed Drugs: A guide to their uses and side effects*, [People's Trial Ex. 1103; Pet'r Habeas Ex. JJ]); (2) if juror Sanchez was not exposed to media broadcasts about the effects of a hung jury from other jurors, then Sanchez must have committed misconduct by learning about the information from another source outside of the jury;[34] and (3) if juror Sanchez's allegation of misconduct was due to his lack of fluency in English, then the juror was not competent, thus depriving Petitioner of her right to twelve competent jurors.[35]

---

[34] Petitioner alleged in the state courts, and here, that the jurors were exposed to media accounts "that the court cost would be a high number if [the jurors] were to have a hung jury, [Petitioner] would walk out free because the state could not afford to go through with the expense." (Pet. at 136.)

[35] The California Court of Appeal lists a fourth allegation of juror misconduct which it found to be procedurally defaulted. In her traverse, Petitioner acknowledges this fourth claim is not raised, and so, not at issue here. That claim states: "Sanchez committed misconduct because he did not 'follow the trial court's

United States District Court

For the Northern District of California

As an initial matter, the Court must first determine whether Petitioner is entitled to an evidentiary hearing on either category of her juror misconduct claims. For purposes of review, the applicable state court decision here is the decision of the California Court of Appeal denying Petitioner's renewed appeal. Although the California Supreme Court denied review of Petitioner's appeals, it did so without comment or discussion. In these circumstances, the Court must look beyond the summary denial to the last reasoned decision as the basis for the state court's judgment. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)). After a thorough review of the record, the Court finds that Petitioner has failed to establish that an evidentiary hearing is required in light of the deference given to state courts' findings under the new statutory requirements contained in 28 U.S.C. § 2254(e).

**A.  Legal Standard**

Before the enactment of the AEDPA, the decision concerning an evidentiary hearing with respect to a habeas petition was firmly committed to the discretion of the district courts, subject to some judicially-created limitations on that discretion. *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999). The amendments contained in the AEDPA, by contrast, limit the power of a federal court to grant an evidentiary hearing. *Williams*, 529 U.S. at 420. The statute provides that a district court may not hold an evidentiary hearing on a claim for which the petitioner has failed to develop a factual basis in state court unless petitioner shows that: (1) the claim relies on (a) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

In compliance with § 2254(e)(2), when the factual basis for a particular claim has not been fully developed in state court, the first question for a district court in evaluating whether to

instructions' and 'refused to accept stipulations.'" (Pet'r Ex. D at 19; Traverse at 31, n.5.)

**United States District Court**

For the Northern District of California

1   grant an evidentiary hearing on the claim is whether the petitioner was diligent in attempting to

2   develop its factual basis. *Baja*, 187 F.3d at 1078. The Supreme Court sets an objective standard

3   for determining "diligence," such that the requirement is dependent upon whether a petitioner

4   "made a reasonable attempt, in light of the information available at the time, to investigate and

5   pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information

6   in the record that would alert a reasonable attorney to the existence and importance of certain

7   evidence, the attorney "fails" to develop the factual record if he does not make reasonable efforts

8   sufficiently to investigate and present the evidence to the state court. *Id.* at 438-40 (counsel

9   lacked diligence because he was on notice of possibly material evidence and conducted only a

10  cursory investigation); *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence

11  because petitioner knew of and raised claims of judicial bias and jury irregularities in state court,

12  but failed to investigate all the factual grounds for such claims).

13          Absent unusual circumstances, diligence requires "that the prisoner, at a minimum, seek

14  an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at

15  437; *see also Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir. 2001), *amended on denial of reh'g*,

16  253 F.3d 1150 (9th Cir. 2001) ("inactions show insufficient diligence" on ineffective counsel

17  claim because petitioner did not request an evidentiary hearing, and brought claim only on appeal

18  not in a collateral proceeding). If this Court determines that a petitioner has not been diligent in

19  establishing the factual basis for her claims in state court, then the Court may not conduct a

20  hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the

21  petitioner has not failed to develop the factual basis of her claim in state court, the Court will then

22  proceed to consider whether a hearing is appropriate or required under the criteria set forth by the

23  Supreme Court in *Townsend v. Swain*, 372 U.S. 293 (1963), *modified by Keeney v.*

24  *Tamayo-Reyes*, 504 U.S. 1 (1992). *See Baja*, 187 F.3d at 1078. The Supreme Court recognized

25  in *Townsend* that the district court judge "has the power, constrained only by his sound discretion,

26  to receive evidence bearing upon the applicant's constitutional claim." *Townsend*, 372 U.S. at 318

27  (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting

28  in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the

48

**United States District Court**

For the Northern District of California

hearing"). This plenary discretion is constrained by six circumstances under which the granting of an evidentiary hearing would be mandatory. In *Townsend*, the Supreme Court concluded that a defendant is entitled to a federal evidentiary hearing on her factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 313.

*Townsend* was modified by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *See Baja*, 187 F.3d at 1078. In *Keeney*, the United States Supreme Court established parallel standards for the grant of an evidentiary hearing in habeas cases with its standards for the consideration of procedurally defaulted claims generally. *Keeney*, 504 U.S. at 10.[36] *Keeney* held that where a petitioner has failed to develop the material facts in state proceedings, no federal evidentiary hearing is required unless the petitioner can show cause for her failure to develop the facts in state court proceedings and actual prejudice resulting from that failure, or, alternatively, that a fundamental miscarriage of justice would result from the failure to hold an evidentiary hearing. *Id.* at 11-12. Thus, the Court in *Keeney*, by employing the "cause and prejudice" and "miscarriage of justice" standards to the failure to develop a factual record, used the same standards that excuse a petitioner's procedural default. *Id.* at 10.

**B. Analysis**

A brief description of the state evidentiary hearing and the pertinent state court rulings will be of some help in determining whether a federal evidentiary hearing is required as to both categories of Petitioner's juror misconduct claims. The California Court of Appeal summarized the facts as follows:

---

[36] In *Keeney*, the issue was whether *Townsend* required federal evidentiary hearings for petitioners who had not "deliberately bypassed the orderly procedure of the state courts." *Keeney*, 504 U.S. at 4. The Court held that this "deliberate bypass standard" was inappropriate and adopted a rule requiring federal habeas petitioners to "show cause for," and "actual prejudice" from, the inadequate development of material facts at the state court proceedings. *Id.* at 5, 8. This distinction is relevant in this case.

49

On August 30, 1993, four days after the jury delivered its verdicts finding petitioner guilty of three counts of murder, trial juror Jesus Sanchez telephoned the trial judge and told the judge "he was concerned with the verdicts and what had happened during jury deliberations."  At that point, the jury had not been excused because the penalty phase of the trial was pending . . . . The court immediately informed the attorneys.

Petitioner's trial counsel suggested that the court was obligated to hold an in camera hearing to discover the basis for Sanchez's concerns and whether any misconduct had occurred.  The prosecutor suggested that the court "do nothing," because "[i]f something has infected the first phase to the extent that it constitutes prejudicial misconduct, there is nothing that can be done now to cure that misconduct."  The defense subsequently obtained information from Sanchez regarding alleged juror misconduct.

Sanchez provided his "notes" about the deliberations to a defense investigator on October 24, 1993.  In conjunction with her February 1994 notice of appeal, petitioner's trial attorneys filed an extensive statement of the "points to be raised on appeal."

While her appeal was pending before [the Court of Appeal], petitioner filed her original petition for a writ of habeas corpus in which she alleged numerous acts of juror misconduct.  This petition was based on a March 1995 declaration by Sanchez into which he had incorporated his "notes" about the deliberations.  In this petition, petitioner alleged that trial jurors had committed four species of misconduct: (1) "receiving evidence from outside the courtroom," (2) "receiving media accounts of the trial," (3) failing to disclose material information and inability to follow instructions on voir dire and (4) discussing the case with a non-juror.  In August 1997, [the state appellate court] affirmed the trial court's judgment, but we issued an "order to show cause . . ." based on Sanchez's declaration, that (1) jurors Miller, Jimerson and McGreevy received "evidence from outside the courtroom" and jurors Jimerson and Hewlett-Ratcliff did "independent outside research from outside sources,"[37] (2) juror Simpson had told other jurors that a media report stated that a hung jury would result in defendant being freed and (3) jurors Simpson and Jimerson "concealed material information and bias on voir dire."

In March 1998, the Attorney General [hereafter AG] filed a return in the superior court to which he attached declarations from the other 11 jurors (besides Sanchez) who had convicted petitioner.  The return denied that any of the alleged incidents of juror misconduct had occurred and challenged the credibility of Sanchez.  Several of the juror declarations stated that Jimerson had been "assigned the task of organizing the drug evidence which was presented during trial," and he had used a "book" which had been "seized from the defendant's home" and had been an exhibit at trial as a source for information about drugs "in order to help the remaining jurors to understand and assimilate the evidence."  One juror described this book as "a paperback book similar to a desk reference book which was a trial exhibit."  Some of the juror declarations also stated that Sanchez had seemed to have "difficulty with the English language" and, in particular, with the concept that "legally prescribed drugs

---

[37] Petitioner alleged in her renewed state habeas, and here, that juror Hewlett-Ratcliff "did independent research on newspaper obituary sections, and read out loud the result of her research to jurors."  Petitioner claims that juror Hewlett-Ratcliff "stated that the obituaries showed that no one old died of natural causes.  Thus, she stated that the victims could not have died of old age."  (Pet. at 129; Ex. G at 5.)  However, other jurors testified that Hewlett-Ratcliff had not brought any newspaper obituaries into the jury room and confirmed that her comment, "people do not die for no reason" was contrary to Sanchez's allegation that Hewlett-Ratcliff had stated that "people do not die of natural causes."  (Pet'r Ex. D at 13-14.)

50

United States District Court

For the Northern District of California

could be a 'poison' . . . ."  Several of the jurors also stated that Sanchez "refused to accept as true certain matters to which stipulations had been entered," and seemed to have and "inability or unwillingness to follow the court's general orders, i.e., to follow jury instructions."

In April 1998, petitioner filed a motion seeking discovery of "written or recorded statements of witnesses or reports of the statements of witnesses from whom the prosecutor has presented testimony by way of declarations or affidavit . . . ."  She argued that this material was discoverable under Penal Code section 1054.1.  The AG did provide petitioner with the addresses and telephone numbers of the jurors, but refused to provide notes or statements of the jurors.  In May 1998, the superior court denied petitioner's discovery motion.

In June 1998, petitioner filed a traverse [in the state superior court] in which she re-alleged "each and every factual contention" in her original petition . . . [I]n addition to these allegations, petitioner allege[d] that "[i]f an evidentiary hearing reveals that Sanchez's declaration is inaccurate due to Sanchez's alleged difficulty with the English language and the meaning of certain words, including the word 'poison,' [then] Petitioner was thus deprived of her state and federal constitutional right to trial by competent jurors."  She also alleged that, "[i]f as the state alleges, Sanchez displayed an inability or unwillingness to follow the trial court's instructions, and refused to accept stipulations, Petitioner was deprived of state and federal rights to an unbiased and impartial jury willing to follow the court's instructions."  Petitioner made no other additional allegations in her traverse that she had not made in her original petition.

The superior court held an evidentiary hearing in September 1998.  At the commencement of the hearing, petitioner affirmed that there were no "procedural abnormalities" involved in the case.  Over petitioner's objections, the superior court limited the evidence at the hearing to that which was relevant to the issues which were the subject of [the state appellate court's] order to show cause.  Nine of the twelve jurors testified at the evidentiary hearing.

The [trial] court denied the petition.  The court explicitly based its decision on the credibility of the witnesses and the evidence.  It found Sanchez to be an interesting witness and 'not very credible' in part because his 'testimony was at great variance with the declarations that he signed.'  The court concluded that Sanchez's notes, regarding the jury deliberation had "an odor to it which made them not credible to support any of petitioner's allegations."  The court also made findings on two additional issues not in the original petition: that Sanchez understood the English language and that the "book's" description of Dalmane was so "very brief that any misuse of the book by the jurors could not have had any significant impact on the jurors since the jurors had so much more detailed information before them at the trial regarding Dalmane."

On March 15, 1999, Petitioner filed a renewed petition [in the California Court of Appeal] challenging the superior court's findings.  She asked [the] court to (1) order discovery of "notes and statements of jurors whose declarations or testimony was offered by the state," (2) "order a further evidentiary hearing, if necessary," (3) "set aside the convictions of petitioner" and (4) order "dismissal of the charges against her with prejudice."

(Pet'r Ex. D at 2-6.)

Regarding the first category of juror misconduct claims, the Court finds that Petitioner did not "fail to develop" the factual basis for her juror misconduct claim in the state courts, and

51

now seeks to present the same evidence heard by the state court in this habeas proceeding.

Therefore, the AEDPA precludes an evidentiary hearing unless Petitioner's allegations, if proved,

would entitle her to relief, and if the state court trier of fact has not, after a full and fair hearing,

reliably found the relevant facts. *See Townsend*, 372 U.S. at 312-13.  To determine whether

Petitioner is entitled to relief or an evidentiary hearing pursuant to *Townsend*, the Court will first

determine whether the state court's determination of the alleged instances of juror misconduct

claims addressed at the evidentiary hearing was in accord with clearly established federal law.

(*See* Pet'r Ex. J, *In Re Puente*, HC 3145 (Nov. 4, 1998).)  The Court will next assess whether

discovery and/or compulsory process should be granted with respect to the facts Petitioner alleges

she failed to develop and for which evidentiary development is sought.  The Court will next

consider whether California's procedural bar prevents the Court from reviewing the merits of

Petitioner's defaulted claims.  If the untimeliness rule is independent and adequate, this Court is

barred from reviewing the California Court of Appeal's decision on these three claims, unless an

exception applies.

### 1.  Juror Misconduct Claims Addressed in the State Court

Petitioner challenges the state courts' findings on her juror misconduct claims on the

grounds that the state superior court denied her a full hearing.  (Pet. at 7-12.)  This challenge was

presented to the Court of Appeal.  That court reviewed the entirety of the evidence from the

evidentiary hearing and further considered whether discovery of additional facts outside the scope

of the Order to Show Cause was permissible.  The court dismissed Petitioner's claims, concluding

that the facts found at the evidentiary hearing did not amount to juror misconduct and that

Petitioner failed to prove her allegations by a preponderance of the evidence.  (Pet'r Ex. A at 7.)

Petitioner argues that, at minimum, an evidentiary hearing in this Court is necessary to

determine whether the jurors' conduct prejudiced the jury deliberations.  Respondent contends that

Petitioner's allegations warrant neither federal habeas relief nor a federal evidentiary hearing

because Petitioner fails to show that the state courts' adjudication of the claims was contrary to, or

involved an unreasonable application of clearly established federal law, or was based on an

unreasonable determination of the facts in light of the evidence presented in the state court.  After

a careful review of the record and relevant cases, the Court is satisfied that the state appellate court's conclusion was not objectively unreasonable when it determined that Petitioner failed to prove her allegations by a preponderance of the evidence.

### a.  Legal Standard

The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors.  U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied [her] constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).  The Sixth Amendment guarantee of a trial by jury requires that the jury verdict be based on the evidence presented at trial.  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997) (en banc).  Jury exposure to extrinsic evidence, *i.e.*, evidence not presented at trial, deprives a defendant of her Sixth Amendment rights to confrontation, cross-examination and assistance of counsel. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).  A petitioner is entitled to habeas relief, however, only if it can be established that the exposure to extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's verdict.'" *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht*, 507 U.S. at 623).  In other words, a petitioner must establish that the error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637.

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips,* 455 U.S. 209, 217 (1982).  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Id.*  Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id.*  Such determinations may properly be made at a hearing. *Id.*

A juror's past personal experiences may be an appropriate part of the jury's deliberations. *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004), *cert. denied*, 126 S. Ct. 177 (2005).

1    In fact, jurors must rely on their past personal experiences when hearing a trial and deliberating on

2    a verdict.  *Id.* at 880 (foreman's reference and reliance on her medical experience in comments to

3    other jurors did not constitute introduction of extrinsic evidence in violation of Sixth Amendment

4    right to confrontation).

5              **b.  Analysis**

6              Here, the Court has reviewed Petitioner's juror misconduct claims addressed in the state

7    evidentiary hearing and finds her challenge to the state court proceedings without merit.  On

8    September 23-25, 1998, a state evidentiary hearing was held pursuant to the Court of Appeal's

9    Order to Show Cause.  On September 25, 1998, the state superior court dismissed Petitioner's

10   juror misconduct claims, concluding that the evidence at the hearing was at variance with the

11   allegations in Sanchez's declaration.  (Pet'r Ex. G.)  Petitioner appealed the decision, arguing that

12   the state court unreasonably denied her claims and that her attempts to develop the factual bases

13   for her misconduct claims were "curtailed."  (Pet. at 112-13; Resp. Ex. CC.)  On July 20, 2000,

14   the California Court of Appeal issued its opinion concerning Petitioner's renewed state habeas

15   petition after independently reviewing all the evidence presented at the evidentiary hearing.  The

16   court found that the evidence did not support Petitioner's claims.  Regarding the claims that jurors

17   Miller, Jimerson and McGreevy discussed with other jurors information from outside the

18   courtroom, the state appellate court found that Sanchez's credibility was harmed because: (a)

19   Miller's testimony that he had neither seen nor mentioned a television program was corroborated

20   by other jurors' testimony, and (b) "[a]lthough Sanchez originally accused both Jimerson and

21   McGreevy of misconduct, he backtracked at the [evidentiary] hearing and accused only Jimerson."

22   (Pet'r Ex. D at 10.)[38]  Regarding the claim of obituary research, the court found that juror

23   Hewlett-Ratcliff's "simple observation that people do not die from some cause was nothing more

24   than common sense."  (*Id.* at 14.)  With respect to the claims that the jurors made reference to

25   media broadcasts about the cost of trial, the court found that the testimony "indicate[d] that [juror

26   Simpson] had not committed any misconduct" based on all the testimony at trial.  (*Id.* at 16.)

27

28

---

[38]  The California Court of Appeal consolidated three of seven of Petitioner's specific allegations regarding the jurors' alleged use of television and newspaper sources.  (*See* Pet. at 7-12.)

United States District Court

For the Northern District of California

1    Regarding the allegation that juror Simpson concealed relevant information on voir dire that she

2    had "personal experience with a woman who killed her own husband [Simpson's father-in-law]

3    and [Simpson's] ex-husband," the court found that Sanchez's credibility was "heavily damaged by

4    his inconsistencies . . . and refutation of a number of other allegations." (*Id.* at 17). And with

5    respect to juror Jimerson's "personal experience with Dalmane . . . or other sleeping

6    pills/tranquilizers," the court found that the evidence did not support Petitioner's allegations. (*Id.*

7    at 17-18.)

8        In sum, the California Court of Appeal agreed with the state superior court's conclusion

9    that Petitioner failed to prove by a preponderance of the evidence any of the alleged instances of

10   juror misconduct. Referring to state law, the court noted that "the superior court's factual findings

11   are entitled to great weight where supported by substantial evidence and deference to these

12   findings is particularly appropriate on issues requiring resolution of testimonial conflicts and

13   assessment of witnesses' credibility" because that court had "the opportunity to observe the

14   witnesses' demeanor and manner of testifying." (Pet'r Ex. D at 6-7, citing *In re Hamilton*, 20 Cal.

15   4th 273, 296 (1999).)

16                          **i.  State Court Determination of Fact**

17       Because Petitioner's application for habeas relief as to the juror misconduct claims was

18   fully presented to the state courts, a factual basis for Petitioner's juror misconduct claims was

19   developed.

20                          **A.  Standard of Review**

21       A federal habeas court may grant the writ if it concludes that the state court's adjudication

22   of the claim "resulted in a decision that was based on an unreasonable determination of the facts

23   in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Section

24   2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the

25   petitioner challenges the state court's findings based entirely on the state court record, whereas

26   § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first

27   time in federal court. *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004). The relevant

28   question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of

55

1   appellate review, could reasonably conclude that the state court findings are supported by the

2   record. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

3       An unreasonable determination of the facts occurs where the state court fails to consider

4   and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly

5   presented and made part of the state-court record. *Taylor*, 366 F.3d at 1005. Where a state court

6   factual finding has been proven incorrect by clear and convincing evidence presented in the state

7   court proceeding, under 28 U.S.C. § 2254(e)(1), that finding is also an unreasonable determination

8   of the facts pursuant to § 2254(d)(2). *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

9                                   **B. Analysis**

10      The Court finds that the state court's adjudication of Petitioner's juror misconduct claims

11   resulted in a decision that was based on a reasonable determination of the facts in light of the

12   evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). In Petitioner's case,

13   the appellate court reviewed her claims after considering all the testimony at the evidentiary

14   hearing. (Pet'r Ex. D.) After a review of the record, this Court concludes that Petitioner had a

15   full, fair and complete opportunity to present evidence in support of her claims to the state courts,

16   of which she took full advantage. Therefore, the Court finds that the appellate court's fact-finding

17   process was intrinsically reasonable.

18      Upon finding that the appellate court's fact-finding process survives an intrinsic review,

19   the Court now turns to the appellate court's determination of the facts which is "dressed in a

20   presumption of correctness." *Taylor*, 366 F.3d at 1000. The California Court of Appeal's factual

21   finding that Petitioner failed to prove her allegations by a preponderance of the evidence in light

22   of the testimony at the evidentiary hearing is presumed correct under section 2254(e)(1) unless

23   rebutted by clear and convincing evidence. As to the request for an evidentiary hearing, Petitioner

24   offers nothing that would indicate that the state court's determination of the facts was incorrect. In

25   other words, Petitioner has not presented any clear and convincing evidence to overcome the

26   presumption of correctness.

27   //

28   //

**United States District Court**

For the Northern District of California

1

### ii. State Court's Legal Determination

2          Relying on post-AEDPA case law, Petitioner argues that because the state court

3    evidentiary hearing was curtailed, the California Court of Appeal's conclusion was unreasonable.

4                                    **A. Standard of Review**

5          Challenges to purely legal questions resolved by the state court are reviewed under

6    § 2254(d)(1); the question on review is (a) whether the state court's decision contradicts a holding

7    of the Supreme Court or reaches a different result on a set of facts materially indistinguishable

8    from those at issue in a decision of the Supreme Court; or (b) whether the state court, after

9    identifying the correct governing Supreme Court holding, then unreasonably applied that principle

10   to the facts of the prisoner's case. *Williams*, 529 U.S. at 402-04, 409. Challenges to mixed

11   questions of law and fact receive similar mixed review; the state court's ultimate conclusion is

12   reviewed under section 2254(d)(1), but its underlying factual findings supporting that conclusion

13   are clothed with all of the deferential protection ordinarily afforded factual findings under sections

14   2254(d)(2) and (e)(1). *Lambert*, 393 F.3d at 978. The Court has already determined that the

15   factual findings are entitled to deference.

16                                          **B. Analysis**

17         Having deferred to the factual findings of the state court, this Court cannot say that the

18   state courts' legal determination does not meet the requirements under section 2254(d)(1). The

19   layers of deferential review mandated by AEDPA show that the last reasoned decision rejecting

20   Petitioner's first category of juror misconduct claims did not result in a decision that was contrary

21   to, or involved an unreasonable application of, clearly established federal law, as determined by

22   the Supreme Court of the United States. 28 U.S.C. § 2254(d). Although Petitioner contends that

23   the state evidentiary hearing was curtailed, this Court cannot find that another evidentiary hearing

24   would be favorable. The declaration from an unhappy juror that some jurors had improperly used

25   their personal knowledge and opinions does not amount to juror misconduct in the federal

26   constitutional sense. *See Grotemeye*r, 393 F.3d at 875 (court refused to permit an evidentiary

27   hearing on juror comments stating that the mere fact that the jury foreman brought her outside

28   experience to bear on the case is not sufficient to make her alleged statements violate

*Grotemeyer's* constitutional right to confrontation).  To be sure, jurors have long been instructed in federal court and state court to do precisely what the jurors did - discuss their personal knowledge and opinions in accordance with the evidence at trial.  *Id.* at 879.  The fact that some of the jurors brought their personal knowledge and opinions, not shared by every other member of the jury, into the deliberations does not convert personal knowledge into extraneous information to the extent that it constitutes extrinsic evidence.  Inevitably, "jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict."  *Hard v. Burlington No. RR*, 812 F.2d 482, 486 (9th Cir. 1987).  Even if the jurors' comments constitute extrinsic evidence, this does not rise to the level of jury misconduct in the federal constitutional sense.  *Id.* at 877; *see also United States v. Navarro-Garcia*, 926 F.2d 818, 821-22 (9th Cir. 1991).

Therefore, Petitioner has not shown that it was contrary to, or an unreasonable application of, Supreme Court precedent for the state court to find that the jurors did not rely upon extrinsic evidence in violation of Petitioner's rights under the Sixth and Fourteenth Amendments. Moreover, even if this finding was erroneous, Petitioner has not shown that consideration of the extrinsic evidence had substantial and injurious effect or influence in determining the jury's verdict.  Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

### 2. Discovery in Habeas Cases

Although Petitioner has not made a specific request for formal discovery, she argues that lack of discovery in the state court proceedings prevented her from developing the necessary facts to ascertain evidence to demonstrate prejudicial juror misconduct.  Therefore, the issue of whether Petitioner failed to develop the facts due to lack of discovery is a separate question which the Court now reviews.  If the facts alleged do not assist Petitioner in demonstrating that she is entitled to relief, the Court will deny further evidentiary development on this issue.

### a. Legal Standard

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery "as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999).  A habeas court should not allow a habeas petitioner "to use federal discovery for fishing expeditions to investigate mere speculation."

1   *Calderon v. United States Dist. Court for the Northern Dist. of Cal*. (*Nicolaus*), 98 F.3d 1102,

2   1106 (9th Cir. 1996); *see also Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970) ("habeas

3   corpus is not a general form of relief for those who seek to explore their case in search of its

4   existence").   Pursuant to *Bracy*, whether a petitioner has established "good cause" for discovery

5   requires a habeas court to determine the essential elements of the petitioner's substantive claim

6   and evaluate whether "specific allegations before the court show reason to believe that the

7   petitioner may, if the facts are fully developed, be able to demonstrate that [she] is . . . entitled to

8   relief." 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

9                                        **b.   Analysis**

10          Here, the Court finds that an evidentiary hearing regarding discovery of additional facts in

11  support of the juror misconduct claim is unnecessary where Petitioner's specific allegations give

12  the Court no reason to believe that she may be able to demonstrate that she is entitled to relief.

13  The California Court of Appeal denied Petitioner's claim of right to discovery on the ground that

14  "there is no [federal] constitutional right to discovery in a criminal case."  (Pet'r Ex. D at 22, citing

15  *Wheatherord v. Bursey*, 429 U.S. 545, 559 (1977).)  The court also relied on state law, holding

16  that "[w]hile the notes petitioner seeks are 'statements' within the meaning of the Penal Code

17  section 1054.1, subdivision (f), a prosecutor's pre-trial discovery obligations under this statute is

18  irrelevant to . . . discovery on habeas petition" because discovery for a state evidentiary hearing is

19  distinct from pre-trial discovery for trial.  (*Id.*)

20          Setting aside whether the state court's standard is the correct one for general discovery in

21  a habeas case, Petitioner does not address in any meaningful fashion whether the jurors' notes

22  and/or juror Bingham's declaration would lead to relevant factual development in addition to the

23  information that she already possessed.  The record shows that Petitioner had a fair opportunity to

24  address the notes of the eleven jurors she attempts to now bolster with discovery.  The gravamen

25  of each of the notes on each juror already appears in the state record and was expanded on during

26  the evidentiary hearing.  An evidentiary hearing in this Court would therefore be futile. *See*

27  *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (holding that where petitioner's claims "can

28

                                              59

1   be resolved by reference to the state court record," an evidentiary hearing will be regarded as futile

2   and, accordingly, will be denied).

3          Furthermore, the Court finds that Bingham's declaration is inapposite to Petitioner's

4   allegation that it confirmed many instances of misconduct.  Petitioner asserts that juror Bingham's

5   declaration confirms that: (1) juror Jimerson used a book to answer jurors questions (the same

6   book that had been admitted at trial); (2) juror Simpson states "she had merely walked by a

7   television broadcast outside the courtroom and overheard a reference to a possible hung jury;" (3)

8   Simpson made a comment about an unrelated murder case; and (4) juror Sanchez had difficulty

9   with the English language because he could not accept that legally prescribed drugs could be

10  poison.  (Pet at 121.)  A review of Bingham's declaration indicates, however, that his comments

11  did not "undermine[] the state court's function in discovering the truth."  (Traverse at 29.)  Rather,

12  Bingham's declaration confirmed what was borne out at the evidentiary hearing, in particular,

13  "that if juror Jimerson ever stated that he had personal knowledge of Dalmane, [I] would

14  remember" and that during jury discussion, "juror Sanchez talked about his own experiences with

15  his landlord."  (Pet'r Ex. I.)  Observing that "in the federal system a post-trial hearing," such as

16  that conducted here "is sufficient to decide allegations of juror partiality," the United States

17  Supreme Court declined to require a state to do more in order to comply with the Due Process

18  Clause of the Fourteenth Amendment.  *Smith*, 455 U.S. at 217-18.  Thus, the evidentiary hearing

19  held by the state court to determine whether there was any jury misconduct was adequate and the

20  evidence advanced at the hearing was sufficient to support the appellate court's determination and

21  alleviate any due process concerns.  *See Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998)

22  ("due process requires only that all parties be represented, and that the investigation be reasonably

23  calculated to resolve the doubts about the juror's impartiality.").

24          Even if the Court considers the evidentiary hearing evidence upon which Petitioner relies,

25  that evidence does not demonstrate that the state courts' fact-finding was incorrect.  *See* 28 U.S.C.

26  § 2254(d)(2).  Petitioner's subjective belief that this evidence will establish juror misconduct is

27  speculative and does not constitute "good cause" for ordering discovery.  *See Bracy*, 520 U.S. at

28  908-09.  Nor does Petitioner's claim that the state superior court curtailed her inquiries render the

**United States District Court**

For the Northern District of California

1   state court decisions defective. It is uncontroverted that, having denied the petition, the California

2   Court of Appeal afforded Petitioner another full and fair fact review of the superior court's

3   findings. And, with the narrow constraint of review under AEDPA, the Court can find no specific

4   allegations to believe that "[P]etitioner may, if the facts are fully developed, be able to

5   demonstrate that [she] is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09. Assuming *arguendo*

6   that the circumstances under which discovery was required did not foreclose an evidentiary

7   hearing, Petitioner would still not be entitled to a hearing because a review of the record shows

8   that she has failed to satisfy the conditions established in *Townsend*. *See Baja*, 187 F.3d at 1078.

9       **3. Procedurally Defaulted Claims**

10       The issue here is whether the procedurally defaulted claims are barred from review in this

11   Court. The Court of Appeal denied Petitioner's newer claims with a citation to *In re Clark*, 5

12   Cal.4th 750 (1993). (Pet'r Ex. D at 19.) The court concluded that these new claims violated

13   *Clark's* untimeliness rule because (1) Petitioner could not properly raise them in a traverse in the

14   state superior court or by argument after the evidentiary hearing, and (2) she failed to present

15   sufficient reasons to justify her failure to raise these new claims previously. The court reasoned

16   that "[w]hen an order to show cause does issue, it is limited to the claims raised in the petition and

17   the factual bases for those claims alleged in the petition." (*Id.* at 20.) Petitioner, nevertheless,

18   raises her three defaulted claims in her current federal petition for a writ of habeas corpus.

19   Petitioner asserts that (1) under California law, the "new claims" were timely, (2) even if

20   untimely, the application of the procedural rule was not clearly and consistently applied, and (3)

21   even if this Court upholds the California rule, Petitioner can show cause for the delay and

22   prejudice. A thorough review of the record shows that Petitioner is not entitled to habeas relief on

23   her new claims because they are barred from review in this Court.

24       **a. Legal Standard**

25       A federal court will not review questions of federal law decided by a state court if the

26   decision rests on a state law ground that is independent of the federal question and adequate to

27   support the judgment. *Ylst,* 501 U.S. at 801-06; *Coleman v. Thompson*, 501 U.S. 722, 729-730

28   (1991). A state court's refusal to hear the merits of a claim because of the petitioner's failure to

United States District Court

For the Northern District of California

1  follow a state procedural rule is considered a denial of relief on independent and adequate state

2  grounds. *Harris v. Reed*, 489 U.S. 255, 260-61 (1989). The procedural default doctrine and its

3  attendant "cause and prejudice" standard are "grounded in concerns of comity and federalism,"

4  *Coleman*, 501 U.S. at 730, and apply whether the default in question occurred at trial, on appeal,

5  or on state collateral attack. *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986). "[A] habeas

6  petitioner who has failed to meet the state's procedural requirements for presenting [her] federal

7  claims has deprived the state courts of an opportunity to address those claims in the first instance."

8  *Coleman*, 501 U.S. at 732. The Supreme Court therefore requires a prisoner to demonstrate cause

9  for her state court default of any federal claim, and prejudice therefrom, before the federal habeas

10 court will consider the merits of that claim. *Id.* at 750.

11     In order for a state procedural rule "to be 'independent,' the state law basis for the decision

12 must not be interwoven with federal law." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *La

13 Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001). The basis for a decision is "interwoven"

14 with federal law when "the state has made application of the procedural bar depend on an

15 antecedent ruling on federal law." *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000)

16 (internal citation and quotations omitted).

17     A state procedural rule is "adequate" if it is "well established and consistently applied" at

18 the time of the default. *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2001) (citing *Poland v.

19 Stewart*, 169 F.3d 573, 577 (9th Cir. 1998) ("A state procedural rule constitutes an adequate bar to

20 federal court review if it was 'firmly established and regularly followed' at the time it was applied

21 by the state court")); *see also Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) ("For a state

22 procedural rule to be 'adequate' to foreclose federal review, it must be 'strictly or regularly

23 followed '"); *Calderon v. United States Dist. Court*, 96 F.3d 1126, 1129 (9th Cir. 1996) (state

24 procedural bar must be clear, consistently applied, and well-established at the time of alleged

25 default). Once the state has adequately pled the existence of an independent and adequate state

26 procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the

27 petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that

28 demonstrate the inadequacy of the state procedure, including citation to authority demonstrating

inconsistent application of the rule. *Bennett*, 322 F.3d at 586. Once having done so, however, the ultimate burden is on the state. *Id.*

### b. Analysis

#### i. Summary Dismissal

In her traverse, Petitioner first argues that the new claims, raised in her renewed habeas petition to the California Supreme Court, constituted a "separate and independent" petition for review based on the state supreme court's original jurisdiction. As such, Petitioner contends that the state supreme court's summary denial of those claims was on the merits, and therefore timely. Petitioner relies on *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992), *cert. denied*, 510 U.S. 887 (1993), for the proposition that where a summary denial by the California Supreme Court is without citation to state authority indicating that the habeas petition was procedurally deficient, the order represents a decision on the merits. This reliance is misplaced.

In *Ylst*, the Supreme Court explained that where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. 501 U.S. at 805-06. More recently, the Supreme Court held that "a California Supreme Court order denying a petition 'on the merits' does not automatically indicate that the petition was timely." *Evans v. Chavis*, 126 S. Ct. 846, 849-850 (2006). In *Evans*, the petitioner filed two pre-AEDPA state habeas petitions, and then, after their denial on the merits, waited three years to file a petition with the California Supreme Court. The state supreme court issued a silent denial without comment. The Ninth Circuit concluded that the federal petition's timeliness depended on whether Chavis' state post-conviction relief application was "pending," therefore tolling AEDPA's limitations period, during the three-year period between the time the California Court of Appeal issued its opinion and the time the petitioner sought review in the state supreme court. The Ninth Circuit held that the state application was "pending" because under Circuit precedent a denial without comment or citation is treated as a denial on the merits, and a petition denied on the merits was not untimely.

The United States Supreme Court found that the Ninth Circuit had erroneously interpreted *Carey v. Saffold*, 536 U.S. 214 (2002), in that the Ninth Circuit had equated denials on

1   the merits by state courts to mean that a petitioner had timely filed the pertinent habeas petition

2   for purposes of federal tolling of the AEDPA limitations statute.  The Supreme Court reversed,

3   holding that a decision on the merits did not necessarily mean that a state habeas petition was

4   timely filed.  *Evans*, 126 S. Ct. at 849-850.  *Evans* reiterates the Court's holding in *Saffold*

5   suggesting there may be a number of reasons a state court addresses the merits of a petition it

6   believes is untimely, "for instance, where the merits present no difficult issue; where the court

7   wants to give a reviewing court alternative grounds for decision; or where the court wishes to

8   show a prisoner . . . that it was not merely a procedural technicality that precluded him from

9   obtaining relief."  *Saffold*, 536 U.S. at 225-26.  Thus, "if the appearance of the words 'on the

10  merits' does not automatically warrant a holding that the filing was timely, the absence of those

11  words could not automatically warrant a holding that the filing was timely."  *Evans*, 126 S. Ct. at

12  849-850.

13      A review of the record shows that the California Court of Appeal's decision, the last

14  reasoned opinion on the claims, explicitly imposed a procedural default.  Thus, the Court reasons

15  that the California Supreme Court's decision later rejecting the same claim did not silently

16  disregard that bar and consider the merits of the petition.  *See id.*

17                          **ii.  Independent State Ground**

18      The state procedural bar applied to Petitioner's new claims was independent of federal

19  law.  In 1998, the California Supreme Court recognized that California courts had routinely

20  considered the federal constitutional merits of habeas petitions when determining whether

21  petitions qualified for an exception to the *Clark* timeliness bar.  *In re Robbins*, 18 Cal.4th 770,

22  812, n.32, 814 n.34 (1998).  However, the state high court made it clear that the California courts

23  no longer would consider the federal constitutional merits of state habeas petitions when

24  enforcing the timeliness bar after their decision in *Robbins*.  *Id.* at 811 ("[W]e shall, in this case

25  and in the future, adopt the following approach as our standard practice.  We need not and will not

26  decide whether the alleged error actually constitutes a federal constitutional violation."*); see also*

27  *Park*, 202 F.3d at 1152 ("The California Supreme Court has adopted in *Robbins* a stance from

28  which it will now decline to consider federal law when deciding whether claims are procedurally

64

United States District Court

For the Northern District of California

1   defaulted.").  The Ninth Circuit held in *Bennett* that after *Robbins* the California courts can no

2   longer consider federal law in making an untimeliness determination, and concluded that a

3   post-*Robbins* application of the untimeliness rule is now independent of federal law.  *Bennett*, 322

4   F.3d at 581-82.

5          California's rule is an independent procedural ground as it is not interwoven with any

6   federal substantive or procedural law.  Petitioner's new claims were raised a year after *Robbins*

7   was decided and the Court of Appeal's decision in July 2000 came nearly two years after the

8   *Robbins* decision.  Therefore, the "independent" prong of the procedural-default analysis is

9   satisfied because Petitioner's case involves a post-*Robbins* application of California's untimeliness

10  rule.  The next step is to determine whether the procedural bar was an adequate state procedural

11  rule barring habeas review.

12                          **iii.  Adequate State Ground**

13         A review of the record shows that Respondent has met its burden of proving that the state

14  bar is adequate and that Petitioner has failed to meet her burden to demonstrate an inconsistent

15  application of the rule.  *See Maass*, 11 F.3d at 914-15.  Respondent provides several cases that

16  support its contention that, subsequent to *Clark*, California courts have consistently applied

17  *Clark's* untimeliness bar.  (Resp. at 60, citing *In re Robbins*, 18 Cal.4th 770 (1998); *In re Harris*,

18  5 Cal. 4th 813, 823 (1993), and *In re Clark*, 5 Cal.4th 750 (1993).)  Respondent also cites

19  *Bennett*, which recognizes that the *Clark* decision set a definite rule for timeliness for prospective

20  application.  *Bennett*, 322 F.3d at 583.  Because the Court finds that Respondent has adequately

21  pled the existence of a procedural bar, the burden shifts to Petitioner who must assert factual

22  allegations that demonstrate the inadequacy of the state procedure.

23         In her traverse, Petitioner cites to *Bennett* and *Karis v. Vasquez,* 828 F. Supp. 1449,

24  1459-60 (E.D. Cal. 1993), to support her argument that the timeliness rule has been applied

25  inconsistently.  Petitioner points out that there are no published California cases which clarify

26  when a petitioner is permitted to raise a related claim in a traverse.  She further points to a

27  footnote in *Clark*, to support her argument that the cases cited by the state appellate court do not

28  establish a clear rule regarding when claims may be raised in a traverse.  (Traverse at 40.)

United States District Court

For the Northern District of California

1    Petitioner, however, merely reiterates the requirements set forth in *Bennett* and the discretionary

2    requirements in *Karis*.  She does not compare the facts of these cases to the facts in her case to

3    demonstrate that the untimeliness rule was inconsistently applied.  Rather, Petitioner reargues the

4    merits of her claim, *i.e.*, the justification for delay for the new claims.  (Traverse at 37; Pet at 127.)

5    Furthermore, Petitioner cites no authority indicating the rule has been inconsistently applied and

6    makes no showing of good cause for avoiding application of the rule.  To determine whether a

7    state procedural rule is adequate, the Court only need to consider whether it is "firmly established

8    and regularly followed" at the time it was applied by the state court.  *See Poland*, 169 F.3d at 577;

9    *cert. denied*, 528 U.S. 845 (1999).  Therefore, the Court will not re-decide whether Petitioner's

10   state petition is untimely, only whether the untimeliness rule is independent and adequate.  *Id*.  In

11   any event, the Court must still determine whether Petitioner can demonstrate cause for the

12   procedural default and actual prejudice, or demonstrate that the failure to consider the claims will

13   result in a fundamental miscarriage of justice.  *Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir.

14   1993); *Coleman*, 501 U.S. at 750; *Park*, 202 F.3d at 1150.  To perform this analysis, the Court

15   must consider the merits of Petitioner's claims.

16            **4.  Exceptions to the Application of California's Procedural Bar**

17            Petitioner argues that even if this Court finds that her claim is procedurally barred, she

18   can show cause for the delay as well as prejudice.  Having concluded that the state court did not

19   err in procedurally defaulting Petitioner's new claim, the inquiry here is whether the state court

20   properly concluded that Petitioner had failed to establish cause and prejudice to excuse her three

21   procedural defaults.  The Court will also address whether Petitioner can establish a miscarriage of

22   justice as an alternative basis for the Court's excuse of her default.  Because the Court concludes

23   that Petitioner cannot establish either cause and prejudice or a miscarriage of justice to excuse her

24   failure to comply with the state's procedural rule, the issue of whether an evidentiary hearing on

25   the subject of her excuses for the procedural default pursuant to section 2254(e)(2) will not be

26   addressed.[39]

27   _____

28            [39] As noted earlier, the Court in *Keeney*, by employing the "cause and prejudice" and "miscarriage of
     justice" standards to the failure to develop a factual record, used the same standards that excuse a petitioner's
     procedural default.  *Keeney*, 504 U.S. at 10.  Because the Court finds that Petitioner could not establish that

United States District Court

For the Northern District of California

### a. Legal Standard

In cases in which a state prisoner has defaulted her federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Satisfying the "cause" standard requires that the petitioner show that "some objective factor external to the defense impeded counsel's efforts" to previously raise the claim in the state court. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Carrier*, 477 U.S. at 488). When a petitioner fails to establish "cause" to excuse a procedural default, a court does not need to address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527, 533 (1986). To satisfy the prejudice part of the cause and prejudice test, the petitioner must show actual prejudice resulting from the errors of which she complains. *Id.*

The second exception allows a federal court to hear the merits of the procedurally defaulted claims if the failure to hear the claims would constitute a "miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 339-340 (1992) (citations omitted). In the federal habeas corpus context, the "miscarriage of justice" exception is limited to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The required evidence must create a colorable claim of actual innocence because the petitioner is innocent of the charge for which she is incarcerated, as opposed to legal innocence which is innocence as a result of legal error. *Id.* at 321-29. It is not sufficient that the evidence show the existence of reasonable doubt; Petitioner must show that "it is more likely than not that no reasonable juror would have convicted her." *Id.*

### b. Analysis

#### i. Cause and Prejudice

The record shows that Petitioner has not identified any circumstance which demonstrates cause to excuse the procedural default. According to Petitioner, she could not have raised the new

---

there was cause, prejudice, or a miscarriage of justice to excuse her procedural default claims, the Court need not address the issue as it relates to the request for an evidentiary hearing.

United States District Court

For the Northern District of California

1  claims in her state habeas petition because she could not have discovered the new jury misconduct

2  issues earlier and none of the other jurors who testified at the hearing would meet with her

3  counsel or investigator.  (Traverse at 42.)  However, the California Court of Appeal found that

4  Petitioner was aware of the existence of the new claims.  As the Court of Appeal reasoned,

5  Petitioner failed to establish that "she could not have discovered this information earlier and offers

6  no explanation for her year long delay after learning the factual basis for these claims before filing

7  her March 1999 renewed petition containing" the new claims.  (Pet'r Ex. D at 20.)  The court also

8  found that "Petitioner was undoubtedly aware of these issues when she filed her traverse because

9  she was responding to a return containing the alleged factual bases for these new claims and her

10 traverse addressed several of these claims."  (*Id.*)  Furthermore, although Petitioner argues in great

11 detail that the delay was also due in part to the curtailed proceeding at the evidentiary hearing, the

12 record shows that compliance with the state procedural rule was possible.  Generally, "cause"

13 cannot be based on the mere inadvertence of the Petitioner or her counsel to take an appeal.  "The

14 mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise

15 the claim despite recognizing it, does not constitute cause for a procedural default."  *Murray*, 477

16 U.S. at 486.  Because Petitioner has not demonstrated that some objective factor external to the

17 defense impeded her effort to comply with the state's timeliness rule, she has not established cause

18 for her default, and, the question whether she would be prejudiced by her inability to raise the

19 claim need not be considered.  *See Carrier*, 477 U.S. at 494.

20                          **ii. Miscarriage of justice**

21         Petitioner has failed to show that "a constitutional violation has probably resulted in the

22 conviction of one who is actually innocent" such that the miscarriage of justice exception applies

23 to her procedurally defaulted claims.  *See Schlup*, 513 U.S. at 327.  Rather, she merely reasserts

24 her claim that the evidentiary hearing was curtailed.  Even assuming that this was the case,

25 Petitioner presents no new facts of actual innocence of the underlying criminal charges to pass the

26 *Schlup* threshold.  *See id.*  Under the actual innocence gateway of *Schlup*, a petitioner's

27 procedurally-barred claim may be considered on the merits if her claim of actual innocence is

28 sufficient to implicate a fundamental miscarriage of justice.  *Majoy v. Roe*, 296 F.3d 770, 775-76

(9th Cir. 2002).  To make a showing of actual innocence, a petitioner must establish that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have found [her] guilty beyond a reasonable doubt.'"  *Schlup*, 513 U.S. at 327.  Petitioner has not met this burden. Petitioner, having failed to establish cause and prejudice or a miscarriage of justice, is therefore not entitled to consideration of her procedurally-barred claims.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  March 10, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**

For the Northern District of California

69